Chief Judge Fuld.
The defendant-appellants, Charles and Marlene Henson, stand convicted, among other crimes, of criminally negligent homicide (Penal Law, § 125.10) in connection with the death in 1970 of their four-year-old son Kip. They *66 seek a reversal on essentially two grounds: first, that the evidence fails to establish their guilt beyond a reasonable doubt and, second, that the introduction into evidence of matters concerning the defendants’ alleged prior conduct toward Kip constituted reversible error.
Kip’s brief and unfortunate life ended sometime before noon on Sunday, August 23, 1970. Between 11:00 and 11:30 a.m. on that day, Michael Corbett, a member of the North Syracuse Volunteer Fire Department, responded to an emergency call that a “ boy had stopped breathing ” at the Henson residence on Catherine Street. Upon arriving there, Corbett went into a bedroom where he found Kip lying in his bed, next to his father, who, ostensibly, was attempting mouth-to-mouth resuscitation. For about 10 or 15 minutes Corbett and his partner attempted their own resuscitative efforts — using a resuscitator to apply oxygen into the child’s lungs and an aspirator to attempt to remove the “ thick mucus ” which had accumulated in Ms mouth and throat — although no “ vital signs of life ” were detected; he appeared, Corbett testified, to be dead. In any event, rushed by ambulance to St. Joseph Hospital in Syracuse, he was pronounced dead on arrival.
The doctor at the hospital observed that the little boy “ looked quite sallow,” that “ Ms body was covered with many black and blue marks, his face was dirty ’ ’ and that the bruises were ie over all extremities; several on the leg, several on the arms, abdomen, chest [and] gemíais.” A later, detailed autopsy report confirmed these observations and, sigmficantly, it was also determined that Kip had been suffering from “ acute bilateral broncMal pneumonia ’ ’ and that that sickness was the immediate cause of Ms death. On being informed that the cMld was indeed dead, Marlene exclaimed, “ 1 Oh God, what will they do to us now.5 55[1]
Bach of the defendants, separately taken into custody for questioning, made statements to the police. Imtially, they disclosed that both parents were aware that the cMld was sick some *67 days before Ms death. Actually, Marlene admitted that she was aware that he had been suffering from “ congestion in his chest ” since August 20, a full three days before he died. Despite their awareness of his condition, on August 22, they acknowledged that they went to a bar and did not return until about 3:00 a.m. of the 23rd; that they each had had about£ £ five or six ” beers; that in preparation for their evening out they had hired a 19-year-old babysitter, Dolores Klochaney, to look after their cMldren and had actually tied Kip in Ms bed ££ by laying him on Ms back * * * with his hands at Ms sides and putting a rope around his waist and arms.”[2]
Their statements further revealed that Mrs. Henson, after taking the babysitter home, did not return to her house until 5:00 a.m. ; that, wMle she was gone, Mr. Henson just ££ stayed up,” listening to the radio, although he was aware that Kip was breatMng ££ the same, real hard ”; that at about 9:30 a.m., Kip tried to say sometMng to his mother but was <£ gurgling ” so she could not understand Mm; that shortly thereafter Ms eyes began ££ rolling back in Ms head ” and Ms right cheek and lips started ££ turmng blue ” and that a wMte foam-like liquid came from Ms nose. It was only at tMs point that the Hensons took any steps to obtain medical attention: Marlene picked up the telephone and asked the operator ££ to send help with some oxygen ”. As already indicated, when the volunteer firemen, who responded, arrived a few minutes later, Kip appeared ££ dead ”.
With respect to the bruises wMch literally covered the youngster’s body, Mrs. Henson told the police that the infant had ££ been falling out of his bed ” for several days preceding Ms death.[3] She further stated that she had “ a discipline problem ” with Kip and that because of this she occasionally ££ slapped ” Mm across the face, “ struck ” him with her husband’s belt and ££ spanked ” him with a ££ pingpong ” paddle; that, when the paddle ££ disappeared,” she used a ££ wooden cooking spoon ” and, more recently, her hand.
*68 On the basis of these statements to the police, the Hensons were arrested on the next day and, following further investigation into the matter, were charged with criminal responsibility for their child’s death in a four-count indictment, manslaughter in the second degree (Penal Law, § 125.15), criminally negligent homicide (§ 125.10), endangering the welfare of a child (§ 260.10, subd. 1) and third degree assault (§ 120.00).[4] The jury found both defendants guilty on those counts charging criminally negligent homicide and endangering the welfare of the child and, in addition, found Mrs. Henson guilty of assault. She was sentenced to an indeterminate term in prison of up to four years, and her husband was placed on probation for five years. The Appellate Division unanimously affirmed the convictions (41 A D 2d 701), and the appeal is here by leave of a judge of this court.

Evidence of Guilt

Contrary to the defendants ’ contention that there was insufficient proof of criminally negligent homicide to justify its submission to the jury, the evidence of guilt is overwhelming.
Section 125.10 of the Penal Law recites that one ‘ ‘ is guilty of [the crime of] criminally negligent homicide when, with criminal negligence, he causes the death of another person.” Subdivision 4 of section 15.05 of the Penal Law, which defines “ Criminal negligence ”, provides that
“ A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.”
Although the criminally negligent offender, the court recently pointed out in People v. Haney (30 N Y 2d 328, 333), is guilty *69 of a “ culpable failure to perceive the [proscribed] risk,” the reckless offender — subject to prosecution for the more serious crime of second degree manslaughter (Penal Law, § 125.15) — is guilty of “ consciously disregard[ing] the risk.” In the course of its opinion, the court went on to declare (p. 334):
“ Criminally negligent homicide, in essence, involves the failure to perceive the risk in a situation where the offender has a legal duty of awareness. It, thus, serves to provide an offense applicable to conduct which is obviously socially undesirable. ‘ [It proscribes] conduct which is inadvertent as to risk only because the actor is insensitive to the interests and claims of other persons in society.’ (Model Penal Code, Tent. Draft No. 9, supra, at p. 53.) The Legislature, in recognizing such conduct as criminal, endeavored to stimulate people towards awareness of the potential consequences of their conduct and influence them to avoid creating undesirable risks. [Authorities cited.] ”
There is no doubt that, in the case before us, the record evidence warranted the verdict that the defendants’ failure to provide prompt medical care for their son reflected “ a culpable failure to perceive a substantial and unjustifiable risk ” of death, constituting “ a gross deviation from the standard of care that a reasonable [parent] would observe ”. In short, there was more than ample proof that Kip was obviously, even to the untrained eye, a very sick child in the days before his death. Indeed, in addition to the defendants’ own statements to the police, the testimony of Dolores Klochaney, the babysitter, is shockingly eloquent not alone of the little boy’s grave plight but also of his parents’ gross insensitivity to his welfare. Thus, on arriving at the Henson home at about 9:30 or 10:00 o’clock on the evening of August 22, she was told by the child’s mother that he had had a cold that week, that he might be “ pesty ” and that she was “ not to bother with him in fact, the girl testified, “ she told me to ignore him if he called.” Moreover, she added, the Hensons left without telling her where they were going and without leaving any telephone number at which they could be reached. Some time after their departure, Kip’s condition worsened significantly; he began “ breathing *70 very hard, real hard ” and a “ red ” substance began drooling out of his mouth. Frightened by those developments, the girl called her parents for help but, because she was so excited, hung up on them before they answered and immediately commenced applying “ hot compresses ” to Kip and then anxiously waited in the living room for the Hensons to return.
When they did finally arrive, Dolores, who noticed that they had been drinking, emphatically told Mrs. Henson that Kip “ seemed awful sick ” and went on to describe how the child had been acting. The mother, however, paid little attention and, although, on the way home, Dolores continued to try to impress upon the older woman that Kip seemed to be extremely ill, she “ tried to change the subject ” and “ started to talk about one of the other kids
Despite the babysitter’s frightening description of Kip’s condition, the record is devoid of any effort on the part of the Hensons to provide him with medical care until it was too late. In fact, the evidence justifies the conclusion that they actually exacerbated the child’s condition; they admitted tying Kip on his back in bed which, quite obviously, made it even more difficult for him to cough up the mucus which for some days had been accumulating in his throat and mouth. Indeed, their daughter Kim, who was eight years old at the time of the trial, testified that her parents tied Kip in bed “ almost every night ” and that, on the day before her brother died, he “ was in his bedroom trying to move a truck, and if he didn’t move quite fast, my mother would hit him.” “ He was sick ”, Kim continued, “ he couldn’t move too fast, and when my mother hit him, when he tried to cry, he couldn’t cry.”
Bearing on all this, and adding weight to the almost irresistible inference of outrageous neglect, was the expert medical testimony adduced by the prosecution.[5] That testimony estab *71 lished that Kip, on August 13, was healthy, “ mentally alert ” and ‘ ‘ oriented ’ ’ and that in the succeeding days — during which he was in the sole custody of his parents — “ something happened that changed [him] from a normal, healthy child to a child who was susceptible to a type of illness [bronchial pneumonia] that we [do] not see in a * * * child of that age.” Their testimony also indicated that, although the “ terminal event ” which caused his death was “ acute bilateral bronchial pneumonia ”, the child’s death was the product of all the “ many fresh and recent injuries ” he had suffered during the last few days of his life. And, finally, as one of the doctors stressed, the injuries suffered by Kip, even complicated, as they were, by the bronchial pneumonia, could have been treated “ almost up to the last moment ” of his life.
There is no need to dwell further upon the evidence adduced at the trial. It is perfectly clear, from what has already been written, that the defendants ’ guilt was established almost beyond all doubt.

Admissibility of Evidence of the Defendants’ Prior Conduct

Toward Kip

It was the defendants’ claim that the horrible abrasions and bruises which covered Kip’s body had been incurred accidentally, that he “ stumbled ” around, frequently fell out of bed and was, in short, accident prone. To refute the claim and demonstrate that the injuries were not accidental or the result of any innocent or justifiable conduct but were, in fact, beatings, criminally administered, the People called several witnesses — including, among others, his teachers in the Head Start program in which he was enrolled until August 14, the director of a private nursery school he attended in 1969 and a foster mother with whom he had been placed temporarily in 1967 — who testified that he was not a problem child or accident prone but was, instead, an average little boy, well-co-ordinated and well-behaved.
In addition, proof was introduced that, on numerous occasions prior to the period covered by the indictment (August 14-August 23, 1970), Kip, while in the sole custody of his parents, suffered injuries similar to those in evidence upon his death. Thus, for example, the child’s foster mother testified that in *72 1967, about a week or two after Kip had left her home, Mrs. Henson told her that Kip had “ scratched ” his face, explaining that the child had “ fallen down some steps.” Similarly, Mrs. Nancy Parody and her daughter, Carol, neighbors and sometime babysitters, testified that they had seen Kip in June of 1968 and that his face was all black and blue. It was Mrs. Henson’s story that Kip had fallen against a “ chicken wire ” fence. A public health nurse testified to similar observations in 1968 and early 1969 which also were explained away by Mrs. Henson as accidental or the result of Kip “ picking ” at himself. And a caseworker with the Onondaga County Protective Services Department testified that in April, 1969, she was at the Henson residence and observed that Kip had “ bruises around his eyes, both his eyes were blackened underneath; there were black and blue marks around both ears, his mouth, and there was a sore, a cut in the back of his head ”. Mrs. Henson, she stated, pointed to a child’s chair less than a foot tall and asserted that Kip had “ fallen out ” of it.
Completely without merit is the defendants’ point that the introduction of the evidence just set out constituted reversible error on the ground that it was merely “ designed to show a propensity or criminal bent to commit the crimes charged ”. It is a well-recognized exception to the general rule, excluding evidence of collateral conduct, that such evidence is admissible if, among other things, it tends to negative the defense of “ accident ” or mistake. (See, e.g., People v. Molineuox, 168 N. Y. 264, 293; People v. Dales, 309 N. Y. 97,101; see, also, 2 Wigmore, Evidence [3d ed., 1940], §§ 302, 312, 325, pp. 196, 215, 228; Richardson, Evidence [9th ed.], § 175, p. 159.) And it is especially warranted in cases such as the one before us, where the crime charged has occurred in the privacy of the home and the facts are not easily unraveled. (See, e.g., United States v. Woods, 484 P. 2d 127; State v. Silva, 153 Me. 89, 98-99; see, also, Wood v. State, 248 Ark. 109, 115; State v. Sanches, 94 Idaho 125, 128; State v. Bradford, 259 La. 381, 392-394; Commonwealth v. Cutler, 356 Mass. 245, 248-249; cf. State v. Parmenter, 74 Wn. 2d 343.)
The defendants, however, insist that there was “no proof ” that the mother’s explanation as to the cause of the earlier *73 injuries was 11 untrue.” This argument, of course, overlooks what is precisely the theory underlying the admissibility of such evidence — namely, that the credibility of the “ accident ” explanation diminishes as the instances of similar alleged “ accidental ” injury increase. (See, e.g., State v. Silva, 153 Me. 89, 98-99, supra; see, also, United States v. Woods, 484 F. 2d 127, supra.)
Admissibility of Expert Medical Testimony Concerning the “ Battered Child Syndrome ”
In the course of questioning one of the medical experts called by the People, the prosecutor asked three or four questions designed to elicit testimony about the so-called 1 ‘ battered child syndrome.”[6] Defense counsel objected and, in each instance, the objection was sustained. Nevertheless, the defendants now urge, in effect, that the questions themselves prejudiced the jury against them. Certainly, the mere mention of the “ syndrome ” could not have prejudiced the jurors; the harm, if any, would have arisen only had the questions been answered. However, quite apart from this, the trial court would have been entirely justified in allowing the witness to respond to the questions as part of the prosecution’s offer of circumstantial proof that the deceased infant’s injuries were not accidental. It follows, therefore, that the questions complained of, even if answered, may not be said to have prejudiced the defendants.
This view finds ample support in decisions not only of various Family Courts in this State in child abuse proceedings (see, e.g., Matter of Young, 50 Misc 2d 271, 272-274; Matter of S, 46 Misc 2d 161, 162; cf. Matter of Santos, 71 Misc 2d 789; Matter of Abeena H., 64 Misc 2d 965) but also of courts in criminal prosecutions in other jurisdictions. (See, e.g., State v. Loss, 295 Minn. 271, 278-281; People v. Jackson, 18 Cal. App. 3d 504, 507; see, also, Commonwealth v. Paquette, 451 Pa. 250, 254-255.)
Initially developed following extensive research more than a decade ago, “ the diagnosis of the ‘ battered child syndrome has become an accepted medical diagnosis. ’ ’ (People v. Jackson, *74 18 Cal. App. 3d 504, 507, supra; see, also, State v. Loss, 295 Minn. 271, 278-281, supra, and, generally, Kempe, Silverman, Steele, Droegemueller & Silver, The Battered Child Syndrome, 13 Journal of American Med. Assn. [1962], p. 105.) “ A finding * * # of the ‘ battered child syndrome ’ ”, the court in People v. Jackson pointed out (18 Cal. App. 3d, at p. 507), “ is not an opinion by the doctor as to whether any particular person has done anything ” but, rather, it “ simply indicates ” that a child of tender years found with a certain type of injury “ has not suffered those injuries by accidental means. ’ ’ Thus, although the decision to admit such expert testimony is within the discretion of the trial court (see, e.g., People s. Jackson, 18 Cal. App. 3d 504, 507, supra), there is little doubt of its relevancy in prosecutions of the kind before us.
As indicated, the diagnosis is used in connection with very young children, around three or four years old, and is based upon a finding that such a child exhibits evidence, among other injuries, of subdural hematoma, multiple fractures in various stages of healing, soft tissue swellings or-skin bruising. Also pertinent to the diagnosis is evidence that the child is generally undernourished and that the severity and type of injury in evidence on his body is inconsistent with the parents’ story of its occurrence. (See, e.g., People v. Jackson, 18 Cal. App. 3d 504, 507, supra; State v. Loss, 295 Minn. 271, 278-281, supra-, Kempe, Silverman, Steele, Droegemueller & Silver, The Battered Child Syndrome, 13 Journal of American Med. Assn. [1962], p. 105.) This sort of expert medical testimony — that the victim is a “ battered child ’ ’ —coupled with additional proof — for instance, that the injuries occurred while the child was in the sole custody of the parents — would permit the jury to infer not only that the child’s injuries were not accidential but that, in addition, they occurred at the culpable hands of its parents. (See, e.g., State v. Loss, 295 Minn. 271, 280, supra.)
The orders appealed from should be affirmed.
Judges Burke, Breitel, Jasen, Jones and Wachtler concur; Judge Gabrxelli taking no part.
Orders affirmed.

. In addition to Kip, the Hensons had three other children — Randy, Kim and Charles. On the day Kip died, Randy and Kim were removed by the Onondaga County Department of Social Services to foster homes where, apparently, they still are. Charles, now nine years old, has been a resident of the Mome State School for mentally retarded children since 1966.

. This, the Hensons said, was necessary to prevent Kip from 16 wander[ing] ” around and from “ pick[ing] ” at scabs on his head.

. Similarly, when confronted by the examining doctor at the hospital, she had stated that “he’d been stumbling around the house and falling into furniture

. The indictment covered the period from August 14 — the last day Kip attended the Head Start program at a local elementary school — until August 23, the date of his death.

. Among others who testified were Dr. Luciano Modesti, a neurosurgeon who examined Kip on August 13, the day before he returned home from the Head Start program; Dr. Martin Hilfinger, the Medical Examiner for Onondaga County who performed the autopsy on Kip; Dr. Milton Helpem, the Chief Medical Examiner for New York City, whose testimony was based, among other things, on the autopsy report; and Dr. Herbert Louri, a neurologist who had participated in the care of Kip during two previous hospitalizations at the Upstate Medical Center.

. One of the questions put to him was, “is a battered-child syndrome, or an abused child, a recognized medical diagnosis ”; another was, “ what is a battered-child syndrome? ”