THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
OLIVER CHARLES KINDER, Appellant.

Fourth Department, May 23, 1980

**APPEARANCES OF COUNSEL**

*John F. Humann* for appellant.

*Edward C. Cosgrove, District Attorney (John DeFranks* of counsel), for respondent.

**OPINION OF THE COURT**

HANCOCK, JR., J.

In his appeal from a conviction after a jury trial for first degree manslaughter (Penal Law, § 125.20, subd 1)[1] in connection with the sadistic beating and torture death of three-year-

---

1. In addition to first degree manslaughter, defendant was also charged with and acquitted of second degree murder (Penal Law, § 125.25, subd 2); second degree manslaughter (Penal Law, § 125.15, subd 1); criminally negligent homicide (Penal Law, § 125.10); and two counts of first degree assault (Penal Law, § 120.10, subds 1, 3).

old James Watts, Jr., defendant claims, *inter alia,* that he was denied his right to a fair trial by rulings of the trial court which effectively precluded full and fair cross-examination of the chief prosecution witness, the child's mother, Diane Watts. We hold for the reasons stated herein that the defendant was provided a fair trial and affirm the conviction. The salient facts are as follows.[2]

On Sunday, January 29, 1978, at approximately 7:00 A.M., James Watts, Jr., six days short of his third birthday and weighing 27 pounds, arrived in an ambulance at the emergency room of the Children's Hospital in Buffalo, not breathing and without a pulse. Twenty-five to thirty minutes of resuscitative efforts by the emergency room personnel were unsuccessful, and the child was pronounced dead. An initial examination of the boy's body revealed numerous bruises scattered over the head, trunk and extremities, a torn frenulum (the piece of tissue which holds the upper lip to the gum), and two quarter-size areas on the buttocks where the skin had been denuded.[3] An autopsy performed later that day revealed abrasions on the child's cheeks, hematomas within and on the exterior of the heart, a black and blue mark on the anterior surface of the liver, internal bruising and bleeding in the pelvic region, including bleeding from the tissues around the rectum and bladder (the boy's scrotum externally exhibited black and blue marks),[4] a linear mark on the base of the penis,[5] and marked swelling and extensive bleeding in all three fossae of the child's brain.[6] Dr. Ernest Fernandez, Erie County Medical Examiner, testified that the bleeding in the brain and the weakened state of the child's body (resulting

---

2. The trial transcript is lengthy. Twenty-four witnesses testified for the prosecution. The defense swore no witnesses. On appeal, defendant makes no claim that the evidence was insufficient to support his conviction.

3. The lesions to the child's buttocks were determined, after autopsy, to be the result of thermal burns, probably caused by a cigarette.

4. On direct examination, the Medical Examiner, Dr. Ernest Fernandez, one of the physicians who performed the autopsy, testified that in his opinion the internal damage to the child's pelvic area was the result of sodomy. On cross-examination, the doctor modified his direct testimony somewhat by testifying that in his opinion the boy was sodomized, but that "he could have obtained that hemorrhage in many other ways."

5. On direct examination, Dr. Fernandez testified that in his opinion, "the penis was tied to prevent [the child] from urinating by a rubberband, or a string."

6. Dr. Fernandez stated that the bleeding had occurred over a period of one or two months as a result of multiple trauma to the head and brain, the final trauma occurring within five days of the boy's death.

from repeated beatings) ultimately led to his death, and that Jimmy was, in his opinion, a battered child—"a child that was injured repeatedly."

The police took Diane Watts to headquarters and after more than 12 hours of interrogation, she gave them a statement. Upon her indictment with defendant for the murder of her son, she moved for and obtained a severance. At defendant's trial she appeared as the chief witness for the prosecution.

Watts testified that she became sexually intimate with defendant shortly after she met him in August, 1977 while she still resided with her husband, James Watts, Sr., and her two children, Jimmy and his younger sister Amber. The defendant became a frequent visitor in the Watts' home, often babysitting for the children. In November, 1977 while Diane Watts was at work, James Watts, Sr., asked Diane's mother and his sister, a nurse, to come over and examine some bruises which appeared on Jimmy's buttocks and lower back. When her husband questioned her about the bruises, she told him untruthfully that she had caused them. It was actually the defendant, she testified, who had been to blame.

On December 22, 1977, without telling her husband, Watts took the household furnishings, the family van, clothing and the two children and moved into an apartment with defendant. In that living arrangement, she stated, defendant could babysit for Jimmy and Amber while she worked.

Following the move, the injuries to Jimmy Watts became more frequent and more severe: e.g., a cut lip, unhealed marks on his buttocks; a limp; an inability to sit down; and complaints of pain in the boy's "rear end".[7] At trial Watts attrib-

---

7. The child's father, James Watts, Sr., and his maternal grandmother, Eileen Brown, also testified that during this period Jimmy exhibited numerous injuries. Mr. Watts stated that when he saw Jimmy in December, 1977, after Diane Watts had moved in with the defendant, the boy had a large scab on his upper lip which Diane attributed to a fall down the stairs; and that when he saw Jimmy again in January, the child still had the scab on his lip and also had scratches on his face and finger. Mrs. Brown testified that when she visited her daughter and the defendant on December 26, 1977, she noticed that the children were quieter than usual; and that in the time period which followed until Jimmy's death, she visited the apartment three or four times a week (the Assistant District Attorney elicited from Mrs. Brown that she was visiting more frequently in order to "check on the kids") and noticed that Jimmy was becoming unusually quiet, that he had a cut lip and was bruised and scratched, that he walked with a limp, that there were scabs on the boy's back and that the boy's buttocks were sensitive to the point that he would not sit down. Brown testified that her daughter attributed most of the injuries to falls down the stairs, admitted to spanking the boy, and on one occasion told her mother to mind her own business.

uted the injuries to the defendant but testified that she also disciplined Jimmy with sticks and belts at the defendant's suggestion and because the defendant would have done it "worse".

On the morning preceding Jimmy's death, before she went to work, Diane Watts testified that no new injuries appeared on Jimmy's body and that there had been none for the previous three or four days. As she was preparing to leave for work, Jimmy told her that he was hungry. At work she received several telephone calls from the defendant reporting: that Jimmy had spilled bread, salt and pepper, had removed his clothing and had eaten cookies at the dining room table; that defendant had given him a whipping and put him in Amber's room; that Jimmy "wouldn't live like that anymore"; that someone had broken in and beaten Jimmy up; that there were bumps on Jimmy's head; that Diane Watts could take him to the hospital if she thought it necessary when she got home; and that he was putting Jimmy down for a nap. When Diane Watts returned home at approximately 9:00 P.M. on Saturday night, Jimmy was lying on the couch under a blanket with a towel on his head, apparently asleep. Defendant told her first that an intruder had beaten the boy up because "some people hate blacks and whites living together" and, then, without attempting to explain the inconsistency, that Jimmy was suffering from the flu. When Watts undressed him and put on his pajamas, Jimmy was limp and she saw that he had fresh bruises all over his body. When she spoke to him, he did not respond. Watts took some sleeping pills and went to bed. The next thing she knew, defendant was screaming at her to come and see if Jimmy was breathing. Watts listened to Jimmy's chest and heard nothing. The boy was limp and blood was coming from his mouth. The rescue squad was called and Jimmy was rushed to the Children's Hospital.

Diane Watts was by no means the only witness linking defendant to Jimmy's death. Henry Johnson described an occurrence in his home on December 26, 1977 when defendant, without any apparent reason, struck Jimmy two or three times with a heavy leather belt and then hit the boy in the middle of his back with a closed fist, knocking the child into the wall. He sat there, Johnson related, "flinch[ing] like he was hurting." The defendant then said, "I would have killed the little bastard." Johnson told of a second incident on January 2, 1978, also in his home. Defendant slapped Jimmy,

who was "squirming" on the couch, and grabbed his shirt, which came off, revealing a "nasty", "dark bruise" on the boy's lower back. Answering Johnson's inquiry as to how it happened, defendant boasted: "You ain't seen nothing either. You ought to see his ass. I kicked his ass." On another occasion, in September, 1977, defendant hit the deceased, who had wet his pants, Johnson stated, using a white belt with metal ornaments.

Michael Lopez testified that on January 28, 1978, the day before Jimmy died, defendant asked him what he would do if he found "a kid playing in his potty and the kid was already toilet trained." Lopez advised the defendant to "give him an ass whipping, but * * * make sure the kid knew what he was getting it for."

Henry Brown, a fellow inmate of defendant's in the Erie County Holding Center for a short time in March, 1979, testified that the defendant had offered him $3,000 if he would tell a friend, who was in a cell near Diane Watts, to stop Watts from testifying. According to Brown, defendant admitted that he had "smacked the kid aside the head and he didn't mean to hit him * * * so hard and the kid had died" and that he "and his girlfriend both had beaten the kid" with sticks and a belt.

At the root of defendant's claim that he was denied a fair trial is the court's assertedly improper curtailment of his right to conduct a full cross-examination of his accomplice Diane Watts concerning her motives in testifying against him. In particular, defendant cites as reversible error the court's ruling precluding further cross-examination as to Diane Watts' knowledge that her trial (originally scheduled to precede defendant's) had been rescheduled and as to her waiver of or plans to waive a jury trial. As further error, defendant alludes to the court's exclusion from evidence of the transcript of the colloquy on April 10, 1979 between the court, Diane Watts' counsel, and the Assistant District Attorney which he asserts would have demonstrated the existence of an "understanding" among the parties that Diane Watts was to receive some form of leniency from the court in exchange for her testimony. Relying on *People v Cwikla* (46 NY2d 434), defendant makes the additional argument that the court and prosecutor improperly misled the jury as to the existence of the "understanding." In our opinion, the court did not unduly restrict the cross-examination of Diane Watts, and did not err

in its exclusion of the transcript. Moreover, the transcript, had it been admitted, would have added little and its exclusion, even if assumed to be error, was harmless. Nor does defendant's claim that the jury was misled as to the alleged understanding warrant reversal of defendant's conviction.

In a lengthy and thorough cross-examination attacking the credibility of Diane Watts, defense counsel succeeded in bringing out, significantly, that Watts and the defendant had been charged and indicted together; that Watts' trial originally was to be held first but had been rescheduled to follow the defendant's;[8] and that Watts may have expected to help her own case by testifying against the defendant. Counsel repeatedly asked the witness why she thought defendant had been tried first and whether she had waived or planned to waive trial by jury. Although the answers were inconclusive,[9] the import of the questioning could not have been more clear: i.e., that Diane Watts had been promised some form of leniency in exchange for her testimony.

Defendant's particular contentions that he was improperly precluded from full cross-examination of Diane Watts as to her knowledge of the rescheduling of her trial and waiver of trial by jury stem from the following series of occurrences during Watts' cross-examination. After establishing that her trial had been rescheduled to follow defendant's, counsel turned to the issue of the waiver of jury trial and, as bearing on the point, attempted to offer as an exhibit a set of omnibus motion papers drawn by Diane Watts' attorneys containing a reference to a jury trial waiver. The court interjected that there was no basis for the line of questioning. An in-chambers conference ensued in which it appeared that the omnibus motion had been made one year earlier before a different Justice and that the trial court had never seen or heard of the motion. On examination of the proposed exhibit, it developed that the papers did not contain an actual application for jury trial waiver but only a *pro forma* reservation of the defendant's rights to request a waiver and a notice that the defendant might do so in the future. No such application had ever

---

**8.** Diane Watts initially denied any knowledge of this. However, after the luncheon recess she admitted that she had been told by her attorneys at lunch that her trial had been scheduled first but that it had been rescheduled.

**9.** She testified that the defendant was tried first "because he didn't like sitting in jail anymore" and that she was out on bail, and also stated that she did not "know much about" whether she or her attorneys had waived trial by jury.

been made. When first made aware of the motion papers, the court immediately announced that it would have to be disqualified if a request for a nonjury trial were ever made. The court then ruled that there was no basis for further questioning on the subject of jury trial waiver and also that it would not allow additional examination on the subject of the rescheduling of the trial date observing that the witness had already testified on that matter.

Upon reconvening the trial, the court gave the jury the objected-to instructions that there was "no basis whatsoever for any questioning along the lines of who comes first and also whether there was any proposition to waive a jury trial." After explaining the purpose of the omnibus motion papers, the court told the jury that the motion had "no place in this trial and it is no basis for suggesting in any way that there is any arrangement between the court or the defendant, or the defendant's attorney or the District Attorney."

■ The court's rulings regarding the subject of rescheduling trial dates do not amount to reversible error. As stated, counsel had already explored the subject in some depth and shown that the Watts trial had been rescheduled to follow the defendant's. While it was error to tell the jury that "there [was] no basis" for the line of questioning, in view of the obvious relevance of the subject, we find minimal prejudice in the remark. The fact of the rescheduling was before the jury, and the court in its final charge diluted the effect of the improper comment by stating: "If you think, however, that maybe because she was tried second, or—and therefore, had an opportunity to come here and testify in this trial, *if you feel that in any way affected her testimony, you are to take into consideration and you can decide to what extent it affected her testimony".* (Emphasis added.)

■ As to the rulings pertaining to the jury trial waiver, we find no error. Watts knew nothing about the reservation of rights in the omnibus motion. Nor was it shown that the possibility of waiver had ever been the subject of discussion between the witness or her attorneys with the District Attorney or with the court. No application for waiver had ever been made. Justice STILLER had no knowledge of the motion prior to defense counsel's attempt to have it marked in evidence.

■ We see no basis for reversal in the exclusion of the transcript of the April 10, 1979 conference which, defendant claims, would have established the "understanding" between

the court, Diane Watts' attorneys and the Assistant District Attorney. The transcript itself shows that no promise of leniency was ever offered in exchange for Watts' testimony. On the contrary, the court took pains to emphasize several times that no commitment or promise had been made and agreed only to the retention of jurisdiction in the Watts case and, if it came to sentencing, to take "everything" into consideration. Arguably, even though Diane Watts was not present at the conference, the transcript could have had some bearing on her state of mind and it would, therefore, assuming a timely offer with a proper foundation, have constituted relevant evidence. Defense counsel, however, who possessed a copy of the transcript before Diane Watts took the stand, never attempted to lay a foundation for its admission by questioning Watts and did not offer it in evidence during her testimony. Instead, he offered it without foundation at the close of the People's case. Moreover, the transcript, had it been received, would have been largely cumulative evidence and would have afforded defense counsel little assistance in his assault on Watts' already damaged credibility. Thus, we hold that it was within the court's discretion to refuse to admit the transcript in evidence.

Defendant's claim that the court or prosecutor somehow misled or misinformed the jury as to the existence or nonexistence of the professed understanding (apparently to bring the case within *People v Cwikla,* 46 NY2d 434, *supra)* finds no support in the record. We see nothing to demonstrate that the court or prosecutor acted in other than good faith, and no evidence of any conduct remotely approaching the deliberate nondisclosure of the correspondence and deceptive behavior of the Assistant District Attorney in *People v Cwikla (supra).*

The court's expressions to the jury of its own subjective view of the colloquy with Watts' attorneys and the prosecutor as not having amounted to a "deal" were unfortunate and should not have occurred. It is apparent, however, that the court's conclusion as to the effect of the colloquy was based entirely on its own legal interpretation of what was said and its recollection that it had made no promises or commitments as to the disposition of Watts case.

In view of the significant evidence of defendant's guilt, aside from the testimony of Diane Watts, and the fact that the suspect nature of her testimony had been clearly and repeatedly emphasized in defense counsel's cross-examination and in

the summations of both prosecutor and defense counsel, and referred to as well in the court's charge, we hold that any error that the court may have made in its handling of this witness does not merit reversal *(People v Crimmins,* 36 NY2d 230).

▉ Defendant's contention that his Sixth Amendment right to counsel was violated by the admission in evidence of his incriminating statements to Henry Brown, after what he asserts was an inadequate hearing under *People v Cardona* (41 NY2d 333), lacks merit.

The *Cardona* hearing, at which the witness Brown and Buffalo Police Chief Leo Donovan testified, provided a sufficient basis for the court's finding that Brown was not acting as an agent for the police and for its decision to admit Brown's testimony. The allegedly critical testimony which defendant argues should have been admitted was that of two police officers to whom Brown had given a statement, approximately one month before his conversation with defendant, pertaining to an unrelated murder case. There was no claim that these officers had ever had any connection with the Jimmy Watts homicide or with the investigation or preparation of the case against defendant. Brown was not placed in a cell near that of defendant until March, 1979 after he had been released from jail and rearrested on another charge. The court properly held that the testimony of the police officers was not significant and not necessary to the *Cardona* determination.

Nor does the letter written by Assistant District Attorney Drury to the Parole Board on Brown's behalf suggest that Brown at the time of the conversation with defendant was acting as a police agent. The letter was written on May 2, 1979, pursuant to Brown's written request dated April 3, 1979, *after* Brown's conversations with defendant which Brown, on his own initiative, had reported to Mr. Drury on March 29, 1979. Acceptance of the proffered information does not establish the existence of an agency relationship (see *People v Cardona, supra,* p 335). Moreover, the evidence is that the defendant's statements to Brown were spontaneously volunteered and would have been properly admitted in any event (see *People v Rogers,* 48 NY2d 167, 174; *People v Hobson,* 39 NY2d 479, 483).

▉ Nor is there reversible error in the admission of testimony that defendant had whipped Jimmy Watts with a belt

in September, 1977, a date prior to the time period covered in the indictment. There was no objection to such testimony and the error is not preserved for appeal (see CPL 470.15; *People v Darrisaw,* 49 NY2d 786; *People v Maschi,* 49 NY2d 784). In any event, the proof of defendant's prior conduct was relevant to disprove defendant's main contention that it was Diane Watts and not he who had beaten Jimmy Watts to death (see *People v Molineux,* 168 NY 264, 313) and to dispel the suggestion from other evidence that the injuries resulting in Jimmy's death were accidental (see *People v Henson,* 33 NY2d 63).[10] For the same reasons, the testimony of Charles Murray that the defendant struck Amber Watts, knocking her against the window of a truck in which they were riding, was admissible.

■ The claimed error in admitting the testimony of Dr. Fernandez, the Erie County Medical Examiner, concerning the "Battered Child Syndrome"[11] was not preserved for review on

---

10. In *People v Henson* (33 NY2d 63), the Court of Appeals affirmed the defendants' convictions for criminally negligent homicide in connection with the death of their four-year-old son, Kip. The body of the little boy, who had died of pneumonia, was covered with bruises and abrasions. The defendants claimed the injuries to Kip's body had been incurred accidentally because the boy was "accident prone." To refute the claim and demonstrate that the injuries were not the result of accidents, the People offered proof of prior similar injuries suffered by Kip when he was in the sole custody of his parents, which the Hensons had also claimed were the result of accidents. The Court of Appeals held that this evidence was admissible under a "well-recognized exception to the general rule, excluding evidence of collateral conduct, that such evidence is admissible if, among other things, it tends to negative the defense of 'accident' or mistake," citing *People v Molineux* (168 NY 264, 293) *(People v Henson, supra,* p 72). The *Henson* court also held that evidence relating to the "Battered Child Syndrome" would have been properly received in evidence "as part of the prosecution's offer of circumstantial proof that the deceased infant's injuries were not accidental." *(People v Henson, supra,* p 73.)

On cross-examination, defense counsel questioned Dr. Fernandez as to whether the injuries to Jimmy's head could have been the result of an accident such as that "caused by the young boy falling over and hitting his head on a hard thing like a floor" and whether the injuries which the doctor attributed to sodomy could have been the result of the child's falling "down on a Fisher Price toy with a point on it that could have gone up his rectum and caused the injury." Counsel also questioned the doctor as to the "possibility that some of those injuries were the result of an accidental falling down."

There was also evidence, brought out by Watts and Eileen Brown that defendant and Diane Watts had upon occasion attempted to explain Jimmy's injuries as the result of such accidents as running into doors, falling down stairs, etc.

11. Dr. Fernandez described the "Battered Child Syndrome" as a situation in which a child shows "any number of external signs of injury which are not congruent with the child growing up", which would be noticed where there is "any sign that [the child] has of being repeatedly hit or mistreated." The doctor testified that in his

appeal (see CPL 470.15; *People v Darrisaw, supra; People v Maschi, supra).* Defendant's only specific objections to the testimony were to Dr. Fernandez' claimed lack of qualification as an expert to testify about the "Battered Child Syndrome". In any event, the evidence was properly admitted under *People v Henson (supra)* to rebut the evidence of accidental injury. The *Henson* case states no requirement, and defendant cites no authority for the proposition, that a claim of accidental injury must be affirmatively raised as a defense before evidence that a child's injuries were not accidentally incurred can be introduced by the prosecution as part of its case.

Defendant's additional contentions provide no basis for reversal of his conviction. The judgment should be affirmed.

SCHNEPP, CALLAHAN, DOERR and WITMER, JJ., concur.

Judgment unanimously affirmed.

---

opinion, Jimmy Watts was a battered child because of the "fact that he had so many different injuries in different stages of resolution."