THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ELIZA-
BETH SIMS, Appellant.

Second Department, September 30, 1985

APPEARANCES OF COUNSEL

*George T. Dunn* for appellant.

*Elizabeth Holtzman, District Attorney (Barbara D. Underwood* and *Peter A. Weinstein* of counsel), for respondent.

**OPINION OF THE COURT**

Brown, J.

The defendant stands convicted of assault in the first degree and endangering the welfare of a child for having intentionally immersed her two-year-old daughter in a tub of scalding

water, as a result of which the child suffered serious burns of her left hand, legs and buttocks, eight of her toes had to be amputated and she was required to undergo numerous painful skin graft operations. On this appeal, we are asked to determine, *inter alia,* whether the trial court erred in permitting the People to introduce on their direct case evidence of the defendant's prior conviction for attempted manslaughter in the second degree in connection with the death of her first child, as well as evidence of prior beatings inflicted upon her other children. Under the circumstances of this case, we conclude that this evidence was properly admitted and that defendant's other contentions on this appeal are without merit.

On the morning of August 12, 1982, Mrs. Christine Stevens, defendant's mother-in-law, received a telephone call from defendant informing her that she had found an empty aspirin bottle on the floor and had noticed that the skin on her two-year-old daughter Tonya's hand was peeling off. Mrs. Stevens' son, defendant's husband, Charles Sims, was in the United States Army stationed in Germany at the time. Mrs. Stevens advised the defendant to give the child warm milk, put grease on her hand and take her to the hospital. Defendant telephoned Mrs. Stevens again later that morning and told her that she had taken Tonya to Brookdale Hospital where doctors had given the child a tetanus shot and put vaseline on her hand. She stated that pursuant to the doctor's instructions, she had taken the child home.

Between 12:00 and 1:00 that same afternoon, defendant brought Tonya and her other daughter, three-year-old Keesha, to Mrs. Stevens' apartment. The visit had previously been arranged in order that defendant, who was pregnant, could attend a prenatal medical appointment at Brookdale Hospital. When the defendant and her children arrived, Mrs. Stevens noticed that skin was hanging from Tonya's left hand and when the child's shoes and socks were removed, she saw that she had no skin on her feet. Defendant assured Mrs. Stevens that she had taken Tonya to the hospital. Later, after the defendant had left for the doctor's appointment, Mrs. Stevens removed Tonya's diaper and discovered that the skin had been burned off the child's buttocks as well. Mrs. Stevens called her family doctor who told her to immediately bring the child to his office. After examining the child, the doctor summoned an ambulance and the child was taken to Brookdale Hospital.

According to Doctor Peter Vaccaro, who examined Tonya in the emergency room at Brookdale Hospital, the child had sustained first, second and third degree burns on her feet, buttocks

and left hand. Doctor Frederic Cohen, who performed skin graft surgery on Tonya, testified that she had also received some fourth degree burns. Both doctors agreed that the burns were caused by a liquid heated to a temperature of over 150 degrees Fahrenheit and that burned portions of Tonya's skin were well defined, with no splash burns or other irregular burns. In Doctor Vaccaro's opinion, the clear demarcation between the burned and unburned portions of skin and the location and extent of the burns on Tonya's legs and buttocks indicated that she had not been burned accidentally. Doctor Vaccaro testified that, in his opinion, Tonya did not receive her burns by accidentally stepping into a tub of scalding water because once one of her feet touched the water she would not then have placed her other foot in the water and sat down. Nor did the burns indicate that she accidentally fell into a tub of scalding water for then there would have been splash burns on other parts of her body. Nor was the child seated in an empty tub while someone turned on the hot water because she would not have remained seated while the scalding water reached a depth of four inches about her feet and three inches about her buttocks. In the opinion of both Dr. Vaccaro and Dr. Cohen, the only reasonable explanation for Tonya's burns was that someone had held her in a horizontal position, with one arm supporting her back and one arm under her knees, lowered her into the scalding liquid and held her there for at least 20 to 30 seconds.

Dr. Vaccaro also testified that had Tonya's injuries been left untreated, she would have faced a serious risk of death from infection and shock. Dr. Cohen further testified that as a result of the burns, Tonya, who had already undergone three skin graft operations and had lost eight toes due to gangrene, would be forced to undergo additional operations and would suffer pain for the rest of her life. Photographs which were taken of Tonya on the day she was brought to the emergency room revealed that, in addition to her burns, she had a scratch behind her ear which was less than a week old and a number of healed scars on her face, chin, arm and legs. According to Dr. Vaccaro, the scars on her legs appeared to have been as a result of her having been struck with a belt.

Jane Askel, a pediatric social worker at Brookdale Hospital who had been assigned to Tonya's case, testified that she had spoken with the defendant on the day after the child had been brought to the hospital and that defendant had told her that when she awakened the day before she had heard water running in the bathroom sink. Later that morning, while dressing Tonya, defendant claimed that she noticed some peeling on Tonya's

feet, but thought it might have been caused by the shoes she was wearing. Ms. Askel stated further that defendant told her that she had taken Tonya to the Bristol Street Clinic that morning for treatment of her peeling feet, and that it was not until they arrived at Mrs. Stevens' apartment that afternoon that she noticed that Tonya's feet and buttocks were peeling badly.

Evidence was introduced which established that, contrary to defendant's statements to Mrs. Stevens and Ms. Askel, Tonya had not been treated at either Brookdale Hospital or at the Bristol Street Clinic on the morning in question. According to the hospital records, Tonya was not admitted to Brookdale Hospital until later that afternoon.

On August 18, 1982, several days after Tonya's admission to Brookdale Hospital, Detective Dennis Mulloy accompanied Mrs. Stevens and Tonya's sister, Keesha, to the emergency room at the hospital. Keesha was examined by Dr. Gregory Menken, who had also examined Tonya at the time of her admission. In the course of his examination of Keesha, Dr. Menken discovered numerous scars on her body. In his opinion, while some of the scars might have resulted from typical childhood accidents, a number of the scars and lesions on Keesha's back, wrists and ankles had been deliberately inflicted.

According to Detective Mulloy, during the course of Dr. Menken's examination of Keesha, defendant arrived at the emergency room and he asked if he could speak to her. He stated that they then stepped into a nearby office, accompanied by another police officer and that before questioning defendant, he advised her of her *Miranda* rights which she waived. Mulloy testified that defendant then stated that on the morning of August 12, 1982, she had fed and dressed her children before taking them to Mrs. Stevens' house and did not notice anything wrong with Tonya at that time.

After speaking with Detective Mulloy, defendant also spoke briefly with Dr. Menken and, according to his testimony, she seemed to be very concerned about the age of the scars found on Keesha's body. She repeatedly inquired as to whether they were recent. She told him that she and her husband used to beat the children and that they had inflicted the old scars but had not done anything recently. According to Dr. Menken, several of the injuries were only a few months old, others had occurred approximately six months earlier, and still others were about one year old. The following day, August 19, 1982, Detective Mulloy arrested defendant.

At the close of the People's case, evidence was introduced indicating that in November of 1979 defendant had pleaded guilty to attempted manslaughter in the second degree in connection with the death of her first child, seven-month-old Frances Nicole Quick, and that the cause of the child's death was a subdural hemorrhage and cerebral edema.

Defendant testified in her own behalf. She claimed that when she awoke on the morning of August 12, 1982, the children were laughing and that when she dressed Tonya she did not notice any injuries. She later called her mother-in-law to tell her that she was on her way over with the children. She specifically denied telling Mrs. Stevens either that Tonya's skin was peeling or that she had taken her to Brookdale Hospital. After dropping the children off at Mrs. Stevens' apartment and speaking briefly with everyone in the apartment, defendant stated that she left for her prenatal checkup. Following her appointment, she said that she had called Mrs. Stevens' apartment and was told that Tonya had been brought to the emergency room. When she reached the emergency room, Mrs. Stevens told her that she had noticed that Tonya's skin was peeling when she went to change her diaper. According to defendant, Mrs. Stevens informed her at that time that she had been told by Keesha that while she and Tonya were playing in the bathtub she, Keesha, had turned on the hot water. Defendant claimed that Keesha later admitted this to her as well. Defendant also asserted, contrary to Detective Mulloy's testimony, that she told him at the hospital that Keesha had caused Tonya's injuries. She also denied telling anyone at the hospital that she and her husband had beaten the children, claiming that her husband was solely responsible for those beatings. Defendant also explained that the death of her first child had been an accident which occurred when she tripped and dropped the baby while attempting to evade her husband who was assaulting her.

During cross-examination, defendant could not recall having given several versions to the police initially and to the court thereafter at the time of her manslaughter plea as to how her first child's death had occurred. Nor could she recall the infant's having suffered a fracture of her upper right arm prior to her death. She did admit, however, that the infant had received two separate fractures on her left arm prior to her death. Defendant also admitted that a social worker who visited her reported in March 1982 that Keesha had a red mark on her forehead and a bruise mark on her cheek. In May of 1982 the social worker reported that Tonya had a red blotch in her eye, a laceration on the left side of her face, and one of her fingers had been smashed

in a door. That same month, Keesha received four stitches in her chin, had bruises on her forehead and the left side of her face and an injured wrist. One of Keesha's teeth had fallen out and defendant said she had pulled another out. In July 1982 Tonya had another red spot on her eye and Keesha had a swollen lip. Defendant admitted that 9 or 10 such injuries had occurred but maintained that they were all accidents.

At the conclusion of its deliberations, the jury returned a verdict finding defendant guilty of assault in the first degree and endangering the welfare of a child. She was thereafter sentenced as a predicate felon to concurrent terms of imprisonment of 7½ to 15 years on the assault charge and 1 year on the endangering the welfare of a child charge.

On this appeal, defendant raises a number of issues. Firstly, she contends that the trial court erred in permitting the People to introduce evidence relating to other injuries to Tonya and Keesha and to her conviction for attempted manslaughter in the second degree in connection with the death of her first child.

It is axiomatic that evidence of uncharged crimes is inadmissible in a criminal proceeding where its sole purpose is to show a predisposition to commit the crime charged (*People v Allweiss,* 48 NY2d 40; *People v Dales,* 309 NY 97). The rule is intended to avoid the possibility that a jury, although not convinced beyond a reasonable doubt of a defendant's guilt of the crime charged, may nevertheless convict that defendant as punishment for his or her past conduct (*People v Fiore,* 34 NY2d 81; *People v Zackowitz,* 254 NY 192; *People v Molineux,* 168 NY 264). It is equally well established, however, that evidence otherwise relevant to prove some material fact is not rendered inadmissible merely because it reveals that a defendant has committed another crime (*People v Molineux, supra*). Evidence of other crimes may be found relevant to prove motive (*People v Vails,* 43 NY2d 364), intent (*People v Schwartzman,* 24 NY2d 241, *cert denied* 396 US 846), the absence of mistake or accident (*People v Dales, supra*), a common scheme or plan (*People v Jackson,* 39 NY2d 64), or the identity of the guilty party (*People v Allweiss, supra*). Nevertheless, even where evidence of the other crimes is found to be relevant to one of these issues and therefore generally admissible, it is still necessary to weigh its probative value against its possible prejudicial effect. Where the probative value is slight in comparison to a great potential for prejudice, the evidence should not be admitted (*People v McKinney,* 24 NY2d 180; *People v Liller,* 20 NY2d 727).

Prior to the trial in the instant case, the prosecutor made an offer of proof as to defendant's prior conviction in connection

with the death of her first child, the evidence of abuse of Keesha and Tonya, and her admissions to Dr. Menken that she and her husband had previously beaten the children. At that time defense counsel conceded that the theory of the defense was that Tonya's injuries were the result of an accident and had been caused by three-year-old Keesha. While the proffered evidence was obviously potentially prejudicial to defendant's case, it was clearly of significant probative value in overcoming the defense of accident.

In *People v Henson* (33 NY2d 63), the Court of Appeals recognized that in a criminal case involving charges of child abuse, evidence of prior injuries to the child is relevant to negate a defense of accident or mistake (*see, People v McNeeley,* 77 AD2d 205; *People v Kinder,* 75 AD2d 34; *People v Santoro,* 68 AD2d 939). The admission of such evidence, the court noted, "is especially warranted in cases such as the one before us, where the crime charged has occurred in the privacy of the home and the facts are not easily unraveled" (*People v Henson, supra,* at p 72; *People v McNeeley, supra,* at p 211; *see also, United States v Woods,* 484 F2d 127, *cert denied* 415 US 979; *State v Silva,* 153 Me 89, 98-99, 134 A2d 628). So, too, in the case at bar, the incident occurred in the privacy of defendant's apartment with no one present other than her two infant daughters. The circumstantial evidence concerning prior injuries to the children was necessary to establish the People's theory of the case and to rebut the defendant's version of what had occurred. Thus, it was sufficiently established that the introduction of the evidence of prior injuries was for a relevant purpose directly related to the issues in the case and not for the collateral purpose of showing a propensity on the part of defendant to commit the crimes charged. In balancing the probative value of this evidence against its potential prejudice to defendant, we agree with Criminal Term that the circumstances tipped the scales in favor of its admission.

Nor does the absence of proof that the prior injuries to Keesha and Tonya were inflicted by defendant rather than their being accidental preclude the admission of this evidence. The theory on which the evidence is admitted is that the credibility of defendant's contention of accidental occurrence diminishes as the number of instances of allegedly accidental injuries increases (*People v Henson, supra*). Under the circumstances of this case, and particularly in light of the theory of the defense that the injuries to Tonya were caused accidentally by defendant's other daughter, the People were properly permitted to introduce this circumstantial evidence to overcome that defense.

■ Defendant also argues that the court abused its discretion in receiving into evidence 12 photographs depicting Tonya's burns and prior injuries. We do not agree. While it has been repeatedly stated that photographic evidence should be excluded if its sole purpose is to inflame the jury, such evidence is properly admissible if it tends to prove or disprove a material fact, to illustrate or elucidate other relevant evidence, or to corroborate or disprove other evidence in the case (*People v Pobliner,* 32 NY2d 356, *cert denied* 416 US 905; *see also, People v Bell,* 63 NY2d 796; *People v De Tore,* 34 NY2d 199, *cert denied sub nom. Wedra v New York,* 419 US 1025; *People v Byrnes,* 33 NY2d 343).

At bar the photographs served a dual purpose. First, those photographs which depicted the burns of the various parts of Tonya's body served to illustrate the testimony of Dr. Vaccaro regarding the clear line of demarcation between the burned and unburned portions of the skin as opposed to irregular burn marks. This evidence was critical to the prosecution's theory, based upon expert testimony, that burns of this nature could not have occurred accidentally but were the result of the child being lowered into the scalding liquid and held there for a period of time. Further, the photographs showing scars from prior injuries were corroborative of the medical evidence indicating a history of injuries which, as noted previously, is relevant in a child abuse case to discredit the notion that the present injuries were accidental (*People v Henson, supra*). Finally, in ruling on the admissibility of the photographs prior to trial, the trial court took efforts to ensure that the prejudice attendant to their admission was minimized. The court precluded the admission of one photograph depicting an expression of pain on Tonya's face, finding it unnecessarily prejudicial, and refused to allow introduction of all other photographs which it found to be merely cumulative.

■ Defendant also claims that the People failed to establish her guilt beyond a reasonable doubt. We disagree. Although the People's case against defendant was based solely upon circumstantial evidence, that evidence was of sufficient quantity and quality to establish her guilt beyond a reasonable doubt. The inferences to be drawn from the proven facts viewed as a whole excluded to a moral certainty every conclusion but guilt (*People v Kennedy,* 47 NY2d 196). In reviewing a conviction based solely upon circumstantial evidence of guilt, a reviewing court must exercise strict judicial scrutiny, not because of any inherent weakness in this type of evidence, but to ensure that the jury has not drawn unsupported or unwarranted inferences from the

evidence (*People v Way,* 59 NY2d 361, 365). Viewing the evidence at bar in the light most favorable to the People, and giving it the benefit of every reasonable inference to be drawn therefrom (*People v Montanez,* 41 NY2d 53, 57), it is clear that the proven facts from which the inference of defendant's guilt is drawn are inconsistent with her claim of innocence and exclude to a moral certainty every hypothesis but guilt.

The evidence reveals that at the time Tonya was brought to the hospital on August 12, her burns were less than 24 hours old. According to defendant's mother-in-law, the burns had already been inflicted at the time Tonya was brought to her home that afternoon. Thus, if this testimony is credited, the burns were inflicted sometime during the morning of August 12 or during the afternoon or evening of the preceding day. According to defendant's own testimony, both of the children were laughing when she woke up on the morning of August 12. From this the jury could properly infer that Tonya's injuries occurred sometime during the morning of August 12 while she was at home with her sister and the defendant. The expert medical testimony offered by the People proved that based upon the pattern in which they occurred, the burns could not have been inflicted accidentally, but rather were the result of someone holding the child and lowering her into the scalding water for a period of at least 20 to 30 seconds.

The final inference to be drawn from the facts is the identity of the perpetrator. The only reasonable inference to be drawn, and that which the jury apparently did in fact draw, was that the perpetrator of these acts was defendant and not her daughter Keesha. Defendant's theory that her daughter Keesha had been playing in the bathroom with Tonya and had turned on the hot water was controverted by the expert testimony that the pattern of burns was inconsistent with someone having turned the hot water on while Tonya was in the tub. Ruling out an accidental cause, it strains credulity to believe that it was three-year-old Keesha who picked up her sister and held her securely enough to immerse her and hold her in scalding water for a prolonged period. Moreover, the evidence of defendant's past history of abusing her children, including her admission that she and her husband had beaten the children in the past, established the existence of a pattern of child abuse which tended to negate the credibility of her claim of an accidental cause for the injuries (*see, People v Henson,* 33 NY2d 63, *supra; People v Kinder,* 75 AD2d 34, *supra*). Also to be considered are the various versions of the events on the morning of August 12 given by the defendant in what was apparently an effort to shift the blame for

the injuries to some other source. For example, she told her mother-in-law that she noticed some skin peeling from Tonya's hand, and later that she took the child to be examined at Brookdale Hospital where doctors put some cream on her hand. This claim was proven to be false at trial. Defendant told Ms. Askel, the social worker, that when she noticed Tonya's feet peeling that morning, she attributed it to the shoes she was wearing and took her to the Bristol Street Clinic for treatment. This claim was also proven to be false. The records of both facilities show that Tonya was not treated at either that morning. What these false statements do indicate, however, is a consciousness of guilt and an effort by defendant to show that no serious burns existed or were noticeable prior to the time she brought Tonya to Mrs. Stevens' apartment (see, People v Levine, 65 NY2d 845). While standing alone, evidence indicating a consciousness of guilt is recognized as being inherently weak (see, People v Moses, 63 NY2d 299, 309), in this case that evidence is but a part of a framework of evidence from which an inference of guilt may reasonably be drawn.

All of the facts in this case taken together are inconsistent with defendant's claim of innocence and exclude to a moral certainty every other reasonable hypothesis but guilt (see, People v Levine, supra; People v Way, 59 NY2d 361, supra). In reaching this conclusion, it is important to note again that in cases involving the abuse of very young children, where the crime usually occurs in the privacy of the home, the facts are not easily revealed. And oft times, as here, the case will of necessity turn upon evidence indicating a history of injuries to the child or expert opinion as to the existence of the battered child syndrome which tends to negate the possibility of accident, together with evidence that the child was in the sole custody of a parent (People v Henson, supra, at p 74). Under these circumstances, the proof at bar was sufficient for the jury to infer that Tonya's injuries were not caused accidentally, but occurred as a result of the actions of her mother, the defendant.

■ We also reject defendant's claim that the trial court erred in refusing to declare a mistrial when it was discovered that several jurors had seen a newspaper clipping concerning the case in Detective Mulloy's file folder while he was testifying. The headline of that clipping read, "Say Mom Scalded Tot". The decision to grant or deny a motion for a mistrial is one which is within the broad discretion of the trial court (People v Ortiz, 54 NY2d 288; Hall v Potoker, 49 NY2d 501; People v Michael, 48 NY2d 1; People v Genovese, 10 NY2d 478). As it relates to matters affecting juror impartiality, the court's exercise of its

discretion in this area must be based upon an examination of "the nature of the material placed before the jury and the likelihood that prejudice would be engendered" (*People v Brown,* 48 NY2d 388, 394; *see also, People v Testa,* 61 NY2d 1008). Recently, in *People v Costello* (104 AD2d 947), this court affirmed the denial of a motion for a mistrial where it was discovered that one of the jurors brought a copy of a newspaper into the jury room. The paper contained an article regarding the sentencing of the defendant's alleged accomplice and referred to testimony by the accomplice at his own trial which inculpated defendant. The trial court held a hearing and interviewed each of the 12 jurors and 4 alternates. Each of the 13 jurors and alternates who had either read the article or heard about it stated that they had not formed an opinion about the case as a result of the article and could arrive at an impartial verdict based solely upon the evidence. In affirming the denial of the motion for a mistrial, this court "[r]ecognizing that we live in a world of swift and widespread dissemination of information, and that reports of crime are, in particular, often highlighted by the news media" reasoned "that mere exposure to accounts in newspapers pertaining to a defendant and his conduct, without more, is insufficient to rebut the presumption of a juror's impartiality and to warrant disqualification" (*People v Costello, supra,* at p 948; *see also, Irvin v Dowd,* 366 US 717, 722-723; *People v Genovese, supra,* at pp 481-482).

In the instant case, upon being informed that the newspaper article had been visible during Detective Mulloy's testimony, the court immediately notified counsel and conducted an examination of the jurors and alternates to determine whether they had seen the article. As a result of that inquiry, it was determined that although a number of jurors either saw the newspaper clipping or were made aware of its existence through discussion with other jurors, only one juror actually read the headline and all were able to state that they could nonetheless confine their deliberations to the evidence. In our view, the court correctly concluded that there was no basis to find that the discussion among the jurors as to the existence of the article amounted to substantial misconduct (CPL 270.35), or that Detective Mulloy's exposure of the newspaper clipping was done deliberately. In sum, the denial of the motion for a mistrial was not an abuse of discretion.

■ Defendant's further claim that her statement to Detective Mulloy at Brookdale Hospital on August 18 was taken in violation of her constitutional rights is also without merit. The hearing court found that defendant, who had appeared at the

hospital on her own and was not arrested until the following day, was not in custody at the time she gave the statement (*People v Yukl*, 25 NY2d 585, *cert denied* 400 US 851). In any event, the court found that defendant made her statement after being advised of her *Miranda* rights and that she voluntarily waived them. We see no reason to disturb these findings on appeal.

█ Finally, we conclude that none of the other contentions raised by defendant has merit and that she has not shown any reason why the sentence imposed upon her should be reduced in the interest of justice (*People v Knowles,* 112 AD2d 321; *People v Young,* 111 AD2d 775).

Accordingly, we conclude that the judgment of conviction should be affirmed.

MOLLEN, P. J., LAZER and MANGANO, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered March 7, 1983, affirmed.