**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Earl Foster BOISE,
Defendant–Appellant.**

No. 89–30071.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1990.

Decided Aug. 29, 1990.

As Amended Sept. 27, 1990.

498

Kenneth Lerner, Asst. Federal Defender, Portland, Or., for defendant-appellant.

William W. Youngman, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before WRIGHT, TANG and CANBY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In April 1988 Quinton Boise, a six-week-old baby, died on the Warm Springs Indian Reservation. Following an investigation, the government charged his father, Earl Boise, with second degree murder in violation of 18 U.S.C. §§ 1111, 1153. A jury found him guilty and the court sentenced him to 240 months of imprisonment.

## I. Sufficiency of the Evidence

Murder in the second degree is the "unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). Boise argues that, because there was insufficient evidence of second degree murder, the district court erred when it denied his motion for judgment of acquittal under Fed.R. Crim.P. 29(c).[1]

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... [is] whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). Specifically, we ask whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789; *United States v. Terry*, 760 F.2d 939, 941 (9th Cir.1985). We respect, however, the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. *United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir.1987) (citing *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir.1977)).

■ Our review of the record in the light most favorable to the government convinces us that a rational jury could have found Boise guilty beyond a reasonable doubt of second degree murder. We acknowledge that the evidence here, as in most child-abuse cases, is circumstantial. But if such evidence is of sufficient quality to convince a jury beyond a reasonable doubt, we require no more. *See Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954).

### A. Evidence that Boise Killed Quinton

Quinton died from bilateral skull fractures that resulted in severe subdural hemorrhaging. In the three hours before Quinton died, Boise admitted he was the sole adult caring for the child. Doctors Lewman, Creelman and Nakamura testified that in their medical opinions the blows most likely "occurred shortly before death." Although they acknowledged that such blows could have occurred the day before Quinton's death or before Boise alone cared for him, in that situation the boy would have shown symptoms of a coma, unconsciousness, vomiting and an inability to eat. No such symptoms were observed.[2]

Witnesses, including Quinton's mother, testified that he had acted normally the day before his death and earlier the day of his death. Boise's own medical expert, Dr. Brady, testified that this was not a "story of a continuous downhill progressive leth-

---

1. Fed.R.Crim.P. 29(c) provides in relevant part: If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged ...

2. Boise argued that Juanita Pacheco, his seven-year-old step-daughter, dropped Quinton the day before his death. Although Juanita admitted that she dropped him on the couch after she gave him a bath, physicians testified that such an accident would not have caused Quinton's head injuries and that there was no evidence that he was injured then.

argy and change" and that there could well have been an injury very shortly before Quinton died.[3] *See United States v. Harris*, 661 F.2d 138, 141 (10th Cir.1981) (sufficient circumstantial evidence that defendant assaulted child where he admitted sole custody at the time when the child received the injuries which caused his death); *United States v. Bowers*, 660 F.2d 527, 529 (5th Cir.1981) (evidence that child was battered coupled with proof that he was in sole custody of parent may well permit jury to infer that the parent injured him).

### B. *Evidence of Malice*

Evaluating the facts and circumstances, the jury infers whether malice is present. *See United States v. Fleming*, 739 F.2d 945, 947 (4th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973 (1985).

> Malice aforethought does not mean simply hatred or ill will, but also embraces the state of mind with which one intentionally commits a wrongful act without legal justification or excuse. It may be inferred from circumstances which show "a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences."

*United States v. Celestine*, 510 F.2d 457, 459 (9th Cir.1975) (citing *Government of Virgin Islands v. Lake*, 362 F.2d 770 (3d Cir.1966)).

From the circumstances of Quinton's death, the jury could rationally conclude beyond a reasonable doubt that Boise displayed "a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences." *Celestine*, 510 F.2d at 459. Physicians testified that Quinton died from two blunt force blows to the head that fractured his skull, causing subdural bleeding and swelling. They also testified that the injuries could not have been accidental, and were most likely caused when Quinton was hit with a hand or thrown against a wall.

There was also evidence that Quinton had been abused previously. Although a blunt force injury to the head was the immediate cause of death, Larry Lewman, the Oregon State Medical Examiner who performed the autopsy, discovered older head injuries that had caused brain hemorrhaging, a broken left arm and 15 broken ribs. He testified that the head-brain injuries were probably caused by violent shaking and that the broken ribs resulted from compression type squeezing.[4]

The evidence showed that six-week old Quinton had received repeated beatings over a period of three and a half weeks and that, finally, two blows to the head, received when he was in Boise's care, killed him. *From such evidence, the jury could rationally conclude beyond a reasonable doubt that Boise killed Quinton with malice aforethought.*

### II. *Admissibility of Prior Injuries, Evidence of Battered–Child Syndrome and Photographs*

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Gillespie*, 852 F.2d 475, 478–79 (9th Cir.1988).

### A. *Autopsy Evidence of Prior Injuries*

■ The district court admitted evidence of Quinton's prior injuries. Evidence of other crimes, wrongs, or acts is inadmissible under Fed.R.Evid. 404(b) to prove a

---

**3.** The dissent contends that "[t]he final hemorrhage may well have occurred spontaneously, without trauma." The flaw in this analysis is that it ignores relevant testimony of the physicians and numerous other witnesses. If the fracture occurred a day before the final hemorrhage, Quinton would have exhibited signs of a head injury. He did not. This was consistent with observations from other witnesses that Quinton was a healthy, normal baby on the day before and the day of his death. Viewing this evidence in the light most favorable to the prosecution, a jury could rationally conclude beyond a reasonable doubt that Boise killed Quinton.

**4.** The government bears the burden of proving that death did not result from heat of passion, recklessness or gross negligence. *See United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987). Here, the jury could not rationally conclude that Boise acted in the heat of passion or with recklessness or gross negligence. We find no such evidence in the record.

person's character, but may be admissible for other purposes such as intent or absence of mistake or accident.[5] The Supreme Court has addressed the question when similar act evidence is admissible under Rule 404(b).[6] *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). There, the petitioner argued that the district court must "make a preliminary finding that the Government has proved the 'other act' by a preponderance of the evidence before it submits the evidence to the jury." *Id.* 108 S.Ct. at 1497.

The Court found that the protection against unfair prejudice to the defendant came not from a requirement of a preliminary finding by the district court but from four other sources. *Id.* at 1502. A court should consider first whether under Rule 404(b) the evidence is probative of a material issue other than character. *Id.* at 1499, 1502.

It should next decide whether the evidence is relevant. *Id.* at 1502. In the Rule 404(b) context, the Court analyzed what it called "questions of relevance conditioned on a fact" under Fed.R.Evid. 104(b),[7] and found that similar act evidence was relevant only if the jury could "reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at 1501. In determining whether the government intro-

duced sufficient evidence to meet Rule 104(b), the Court indicated that the district court should examine the evidence and decide whether the jury could reasonably find the condition by a preponderance of the evidence. *Id.*

After finding evidence of prior bad acts admissible, a court should determine whether under Fed.R.Evid. 403 the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice.[8] *Id.*, 108 S.Ct. at 1502. Finally, upon request, a court should instruct the jury under Fed.R.Evid. 105 that evidence of similar acts may be considered only for the proper purpose for which it is admitted. *Id.*

Boise contends that Quinton's prior injuries were inadmissible under Rule 404(b) because there was insufficient evidence to support a finding that he inflicted them. Applying *Huddleston*, we find that the district court did not abuse its discretion when it admitted the evidence. *See United States v. Lewis*, 837 F.2d 415, 418–19 (9th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

First, the prior abuse of Quinton was under Rule 404(b) probative of a material issue other than character; that is, it was evidence of malice and absence of accidental death.[9] *See Lewis*, 837 F.2d at 419 (acts

5. Fed.R.Evid. 404(b) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

6. In this circuit, we require that: 1) the evidence of prior conduct tend to prove a material point; 2) the prior act not be too remote in time; 3) the evidence be sufficient to support a finding that the defendant committed the act; and 4) in some cases, the prior act be similar to the offense charged. *United States v. Miller*, 874 F.2d 1255, 1268 (9th Cir.1989); *United States v. Spillone*, 879 F.2d 514, 518–19 (9th Cir.1989). Boise does not contend that the prior acts were not similar or were too remote in time. We analyze the other two requirements in the context of *Huddleston*.

7. Rule 104(b) provides:

When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

8. Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

9. Boise argues that *McGuire v. Estelle*, 902 F.2d 749 (9th Cir.1990), controls this case. We disagree. There, the court found that McGuire's trial had been fundamentally unfair because of a number of severe trial errors. *Id.* at 755. First, the prosecutor had not in a meaningful way connected the defendant to the prior acts of child abuse. *Id.* at 754. Second, the prosecutor introduced evidence solely to establish that the

of prior abuse admissible to prove the defendant acted with malice aforethought); *United States v. Leight*, 818 F.2d 1297, 1301, 1303 (7th Cir.) (prior acts relevant to show malice, knowledge and absence of accident), *cert. denied*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *United States v. Colvin*, 614 F.2d 44, 45 (5th Cir.) (pattern of abuse admitted to prove malice aforethought), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 802 (1980); *United States v. Woods*, 484 F.2d 127, 133–34 (4th Cir.1973) (evidence admissible for any purpose other than to show a propensity or disposition to commit the crime), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974).

Second, the evidence of prior injuries was relevant under *Huddleston* only if the jury could reasonably conclude that the injuries occurred and that Boise inflicted them. The autopsy report revealed that Quinton had several prior injuries, including head injuries that had caused brain hemorrhaging, a broken left arm and 15 broken ribs. These were not accidental. The older head injuries, probably the result of excessive shaking, were inflicted a day or two before death. Boise was then the primary caretaker. Although Sheri Boise also had access to Quinton, she testified that she never shook him.

Quinton's left arm and 15 ribs were broken when the Boises were in Nevada. Although physicians could not pinpoint the exact date of injury, the evidence showed that Boise and his wife were the primary care-takers during March.[10] There was no suggestion at trial that she mistreated the boy. She testified that she never squeezed him too hard and that she did not know how he was injured.[11] There was evidence that Boise inflicted the fatal blows to the head. *See Huddleston*, 108 S.Ct. at 1502 (court reviews not only the direct evidence but also considers the evidence surrounding the crime actually charged). Given this evidence, the jury could reasonably have concluded that Boise inflicted the injuries. The court properly allowed this evidence to go to the jury.[12] *See Harris*, 661 F.2d at 141 (sufficient circumstantial evidence to permit jury to infer that defendant struck child on prior occasions); *Colvin*, 614 F.2d at 45 (sufficient proof linking the appellant to prior injuries).

Third, Boise contends that the district court abused its discretion in admitting evidence of the prior injuries because under Fed.R.Evid. 403 the probative value was substantially outweighed by the danger of unfair prejudice. This argument lacks merit. Although that evidence may have been prejudicial, it was highly probative on the question of intent and absence of accident.[13] *See Lewis*, 837 F.2d at 419 (prior abuse not excluded under Rule 403 because of probative value in disproving claims of

---

defendant was a child abuser. *Id.* at 754–55. Third, the trial court had improperly instructed the jury that if it thought the defendant committed the previous "offenses," they could find him guilty of the charged offense. *Id.* at 754–55.

In contrast, Boise's trial did not suffer from any of these errors. The government introduced evidence from which a jury could reasonably conclude that Boise had injured Quinton. The evidence was introduced to prove beyond a reasonable doubt that, under 18 U.S.C. § 1111, Boise killed Quinton with malice aforethought and that he did not die accidentally. Finally, the court carefully instructed the jury that it could consider the earlier injuries to negate accident only if it found beyond a reasonable doubt that Boise had committed the acts charged in the indictment.

**10.** Boise argues that he was not in Reno during the time when Quinton's ribs were broken. We disagree. Although the radiologist's testimony was unclear, the ribs appear to have been broken in the latter part of March. Boise had access to Quinton up to March 29.

**11.** Although Quinton's mother stated that she thought she broke his arm when she rolled over him in bed, physicians testified that the injury could not have been caused that way.

**12.** Boise relies on *United States v. Brown*, 608 F.2d 551, 555 (5th Cir.1979), where the court reversed the conviction because the government failed to produce any evidence that the defendant caused the child's prior injuries. Here, the government presented such evidence.

**13.** In applying the fourth part of *Huddleston*, Boise did request an instruction under Rule 105 that the jury consider similar act evidence only for the purposes for which it was admitted. The court properly instructed the jury that the prior injuries were not proof that Boise committed the acts charged and were relevant only as proof of the manner of death and of intent.

intent or accidental death); *Leight,* 818 F.2d at 1304 (not abuse of discretion to conclude probative value of earlier child abuse outweighed unfair prejudice); *Harris,* 661 F.2d at 142; *Colvin,* 614 F.2d at 45.

The district court did not abuse its discretion when it admitted evidence of Quinton's prior injuries.

### B. *Admissibility of Battered–Child Syndrome*

Although the immediate cause of death was two recent skull fractures, Lewman diagnosed Quinton as suffering from the battered-child syndrome. He described that as a generic, medical term applied to a group of injuries resulting from non-accidental causes but that the syndrome did not provide evidence of who injured the child.[14] The prior head injuries caused by violent shaking, and the broken ribs caused by a compression type force, were indicative of the syndrome.

#### 1. Relevance

■ Boise argues that evidence of the battered-child syndrome was inadmissible because it was irrelevant. We disagree. It was admissible as evidence of intent and of the absence of accident. *See Bowers,* 660 F.2d at 529 (proof that child suffers

from battered-child syndrome may show that parent's explanation of injuries is a fabrication and that they occurred deliberately).

#### 2. Qualification Under the *Frye* Test

■ Boise argues that the autopsy conclusion that Quinton died from the battered-child syndrome should not have been admitted without a finding that an established definition had gained general acceptance. When expert opinion based on a " 'scientific principle or discovery' is proffered, 'the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Gillespie,* 852 F.2d at 480 (quoting *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)). A proponent of scientific evidence that has yet to gain general judicial recognition must lay a proper foundation to show the underlying scientific basis and reliability of the testimony. *Gillespie,* 852 F.2d at 480.

■ Because battered-child syndrome has gained general judicial recognition, the proponent was not required to qualify it under *Frye.*[15] Although circuit and state courts have not reviewed its admissibility under *Frye,* they have recognized it as an accepted medical diagnosis and have approved its use.[16] *See, e.g., McGuire v. Es-*

---

**14.** The term battered-child syndrome was first coined by Dr. Henry Kempe and his colleagues in an article in which they described it:

> The battered-child syndrome may occur at any age, but, in general, the affected children are younger than 3 years. In some instances the clinical manifestations are limited to those resulting from a single episode of trauma, but more often the child's general health is below par, and he shows evidence of neglect including poor skin hygiene, multiple soft tissue injuries, and malnutrition. One often obtains a history of previous episodes suggestive of parental neglect or trauma. A marked discrepancy between clinical findings and historical data as supplied by the parents is a major diagnostic feature of the battered-child syndrome.... Subdural hematoma, with or without fracture of the skull, is ... an extremely frequent finding even in the absence of fractures of the long bones.... The characteristic distribution of these multiple fractures and the observation that the lesions are in different stages of healing are of additional value in making the diagnosis.

Kempe, Silverman, Steele, Droegmuller & Silver, *The Battered–Child Syndrome,* 181 J. A.M.A. 17, 17–18 (1962).

**15.** Boise objected also to Lewman's qualification as an expert. The court did not abuse its discretion under Fed.R.Evid. 702 by finding that he was qualified and that his testimony would assist the jury. He was Board Certified in pathology, was the Oregon Medical Examiner for violent and unexplained deaths, and taught police officers and physicians to detect child abuse.

**16.** Boise argues that the term battered-child syndrome should not have been admitted because its danger of unfair prejudice outweighed its probative value under Rule 403. We disagree. *See Moyer,* 727 P.2d at 338; *Goblirsch,* 246 N.W.2d at 15 ("[U]se in this case [of the term battered-child syndrome] was potentially no more prejudicial than the revolting nature of the infant's injuries themselves, as the physical evidence of her extraordinary injuries shows and the unanimous opinion of the testifying doctors was that they were not caused accidentally.").

*telle,* 902 F.2d 749, 754 (9th Cir.1990); *Bowers,* 660 F.2d at 529; *State v. Moyer,* 151 Ariz. 253, 727 P.2d 31, 33 (Ct.App.1986); *People v. Jackson,* 18 Cal.App.3d 504, 507, 95 Cal.Rptr. 919, 921 (1971); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678, 682 (1981); *State v. Wilkerson,* 295 N.C. 559, 247 S.E.2d 905, 911 (1978); *State v. Goblirsch,* 309 Minn. 401, 246 N.W.2d 12, 15 (1976); *People v. Henson,* 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358, 363–64 (1973); *State v. Tanner,* 675 P.2d 539, 543 (Utah 1983), *superseded on other grounds,* 743 P.2d 191 (Utah 1987); Meyers & Carter, *Proof of Physical Child Abuse,* 53 Mo.L.Rev. 189, 203 (1988) ("Battered child syndrome is well accepted by medical science, and it should not be necessary to lay a foundation with regard to acceptance of the syndrome.").

## C. *Photographs*

■Boise argues that the use of an autopsy photograph was prejudicial under Rule 403. We find no abuse of discretion. *See Bowers,* 660 F.2d at 529–30 (admission of photograph of child's lacerated heart not an abuse of discretion); *see also Batchelor v. Cupp,* 693 F.2d 859, 865 (9th Cir.1982) (admissibility of photographs of homicide victims was not unfairly prejudicial), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983).

## III. *Voir Dire*

Examination or voir dire of prospective jurors protects a criminal defendant's Sixth Amendment right to an impartial jury. *United States v. Giese,* 597 F.2d 1170, 1181 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). The district court may conduct the examination, or it may allow counsel to examine prospective jurors.[17] If it conducts the examination, it may allow the attorneys to supplement the questioning, or may itself ask additional questions as needed. *Id.*

The district judge has discretion in conducting voir dire and we will not find reversible error unless the questions asked or procedures used were so unreasonable as to constitute an abuse. *United States v. Baldwin,* 607 F.2d 1295, 1297 (9th Cir. 1979). We will not find an examination inadequate unless the judge failed to ask questions capable of revealing prejudices of prospective jurors. *Giese,* 597 F.2d at 1182.

■ Boise contends that the voir dire was inadequate because the judge did not conduct a "penetrating inquiry" of the prospective jurors' personal experiences with child abuse and possible racial bias. This contention is without merit.

The district judge conducted voir dire. She first questioned the prospective jurors about whether they had experiences with Native Americans and child abuse, and followed with questioning of individual jurors who responded affirmatively to the initial inquiries. She offered to talk privately in chambers with any juror who answered affirmatively to the sensitive question whether they personally had been victims of child abuse. Her questions would have revealed jurors' prejudices.

Boise also argues that voir dire was inadequate because the judge did not ask all of his questions. Rejecting a similar argument in *Giese,* we held that the district court "has considerable discretion to accept or reject proposed questions ... and as long as it conducts an adequate voir dire, its rejection of a defendant's specific questions is not error." *Giese,* 597 F.2d at 1182–83. The judge did not abuse her discretion in rejecting some of counsel's questions.

■ Boise contends that voir dire was inadequate in light of pretrial publicity. "In a case of *substantial* pretrial publicity, the voir dire must not simply call for the

---

**17.** Fed.R.Crim.P. 24(a) states:

The court may .permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall per-

mit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice." *United States v. Polizzi*, 500 F.2d 856, 879 (1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975) (emphasis in original). A rigorous voir dire is necessary when pretrial publicity is great, but "[i]n cases of less publicity ... [s]everal general questions addressed to the entire panel of jurors, followed by individual questioning of jurors who respond affirmatively to the initial inquiries, may be sufficient if it becomes clear that few jurors have any knowledge of the case." *Giese*, 597 F.2d at 1183.

The evidence shows clearly that these jurors had no knowledge of the case and that the publicity was not substantial enough to require lengthy examination. The newspaper articles submitted to the court dealt only with child abuse and none mentioned Boise or the death of his son. *See United States v. McDonald*, 576 F.2d 1350, 1354–55 (9th Cir.) (no substantial publicity where press coverage of land fraud schemes mentioned defendant only once), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124; *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978). Having established that the jurors had no knowledge of the case, there was no need for the judge to follow with additional inquiries. "Further questioning may have only fanned the embers of incipient prejudice by arousing curiosity." *United States v. Flores–Elias*, 650 F.2d 1149, 1150–51 (9th Cir.) (widespread press coverage of smuggling illegal aliens mentioned defendant only once), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981) (citing *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962)).

The district judge did not abuse her discretion and her voir dire was adequate in all respects.

## IV. Sentencing Guidelines

### A. Retroactive Application of Mistretta

■ The district court applied the Sentencing Guidelines. Although the defendant committed this crime when the Sentencing Guidelines were in effect, at the time of trial this court had declared them unconstitutional. *See Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir.1988), *vacated sub nom. United States v. Chavez–Sanchez*, 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989). By the time of sentencing the Supreme Court had held the Guidelines constitutional, implicitly overruling *Gubiensio–Ortiz*. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

Boise argues that he detrimentally relied on the unconstitutionality of the Guidelines in deciding to go to trial and in making strategic trial decisions. He contends that the retroactive application of *Mistretta* denied him fundamental fairness and due process.

We rejected a similar retroactivity argument in *United States v. Kincaid*, 898 F.2d 110, 111 (9th Cir.1990). There, the Guidelines were in effect when Kincaid committed a crime but were unconstitutional when he pleaded guilty. The district court sentenced him under the Guidelines after *Mistretta*. On appeal he argued that *Mistretta* should not be applied retroactively to pleas made while the Guidelines were unconstitutional. We held that his detrimental reliance on *Gubiensio–Ortiz* did not constitute a "substantially inequitable result" which would preclude retroactivity. *Id.*

The Guidelines were in effect at the time of this crime. The only difference with *Kincaid* is that Boise went to trial. We see no reason to treat the two cases differently. Boise and his attorney were "on notice that the Guidelines were in effect and that the Supreme Court might vacate [*Gubiensio–Ortiz*]." *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1053 (9th Cir.1990). The retroactivity analysis in *Kincaid* applies equally to a decision to go to trial and one to plead guilty.

### B. Applicability of the Vulnerable Victim Adjustment

■ The district court determined that the vulnerable victim adjustment applied to

Boise and increased his offense level by two. He argues that the Commentary to the vulnerable victim guideline requires a defendant to select a victim intentionally because of his vulnerability. We disagree. Under Sentencing Guidelines Ch. 3, Part A, § 3A1.1, a court is to increase an offense level by two "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." The Commentary states that an adjustment is to be made when:

> an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply ... where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

Boise's son was a vulnerable victim for purposes of adjusting the base offense level because a six-week old infant is "unusually vulnerable due to age," not because Boise selected him because of his vulnerability. *Cf. United States v. Roberson*, 872 F.2d 597, 608–09 (5th Cir.) (84–year old man is a vulnerable victim due to age), *cert. denied*, —— U.S. ——, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989).

We find that the district judge's application of the vulnerable victim adjustment was proper.

### C. Constitutionality of the Guidelines

■ Boise contends that the Guidelines violate the separation of powers doctrine. He argues that, when the probation officer recommended that the court apply the vulnerable victim guideline, he was an advocate as a member of the judicial branch. We rejected this argument in *United States v. Belgard*, 894 F.2d 1092, 1096–99 (9th Cir.1990). We held that the probation officer's involvement in sentencing did not violate either the separation of powers doctrine or due process because the officer's report is not binding on the judge and the court's power to appoint an independent investigator to gather information for sentencing is consistent with prior Supreme Court holdings. *Id.*

### V. Conclusion

We find sufficient evidence to support the jury's determination that Boise killed Quinton with malice aforethought. The district court did not abuse its discretion when it admitted evidence of the battered-child syndrome and of prior injuries and when it admitted the photographs. Its voir dire was adequate and it properly applied the Sentencing Guidelines.

AFFIRMED.

TANG, Circuit Judge, dissenting:

Someone repeatedly and severely abused Quinton Boise. Sometime during the few days before Quinton died, the same person fractured Quinton's skull. Twenty-four to forty-eight hours before he died, Quinton hemorrhaged subdurally—that is, bled within his skull. He hemorrhaged again in the few hours before he died. For those last few hours, Earl Boise was Quinton's sole adult caretaker. From that, the prosecution sought to prove, not that Boise was criminally negligent, but that he struck the fatal blows. The jury found him guilty.

The majority concedes that the evidence is entirely circumstantial that Boise killed Quinton. Indeed, other than the circumstantial evidence that relates to Quinton's final hemorrhage, there is no evidence that Boise ever harmed Quinton. But the majority finds the testimony of prosecution experts Doctors Lewman, Creelman, and Nakamura sufficient evidence for a jury to conclude beyond a reasonable doubt that he struck the fatal blows. The majority believes these doctors testified "that if the boy had received the fatal head injury earlier [than his last few hours], he would have shown symptoms," and "that in their medical opinion the blows [that ultimately killed Quinton] most likely occurred shortly before death." Opinion at 499 n. 2. "[M]ost likely," however, is not beyond a reason-

able doubt.* But even were "most likely" enough, the majority has misstated the testimony by failing to distinguish the expert's testimony about the final hemorrhage from their testimony about the trauma that ultimately caused it.

There need be no doubt or dispute that some trauma, and presumably someone, fractured Quinton's skull; no doubt that some trauma caused him to hemorrhage subdurally 24–48 hours before he died; and no doubt that whoever is responsible for that trauma is responsible for Quinton's death. But there is no evidence that Quinton was reinjured again before his final hemorrhage. The final hemorrhage may well have occurred spontaneously, without trauma.

Thus Dr. Lewman responded to a long hypothetical, "Given that scenario and with reference to the recent findings, *the edema and the subdural hematoma*, it [that is, the trauma that fractured Quinton's skull] occurred shortly before death." Trial Transcript at 359 (emphasis added). But Dr. Lewman also distinguished the skull fractures from the bleeding.

Q It's true, is it not, that the skull fractures can occur with little or no subdural bleeding?

A Yes.

Q And conversely, you can have this kind of lethal brain damage ... without skull fractures?

A That's true.

Trial Transcript at 389 (Dr. Lewman testifying).

Q The fracture—if there was bleeding 24 hours before this baby died, you found some evidence that that in fact occurred?

A Certainly could have. Some of the changes are compatible with that.

---

* Although the majority correctly notes that the evidence must be sufficient to show guilt beyond a reasonable doubt, it discusses the evidence as if the standard were a preponderance. "A jury could reasonably infer that Boise killed Quinton." Opinion at 500. "[T]he jury could reasonably infer that Boise displayed 'a wanton and depraved spirit....'" Opinion at 500. "The jury could reasonably infer that Boise killed Quinton with malice aforethought." Opinion at 500.

Q And you cannot state to a medical certainty that the fracture ... did not occur at that time as well, can you?

A No.

Trial Transcript at 395 (Dr. Lewman testifying).

Dr. Creelman, asked whether Quinton "could have survived any significant length of time," responded, "Not with the amount of *bleeding* that was evident *at the time of autopsy.*" Trial Transcript at 261–62 (emphasis added). Dr. Creelman also testified that

you can have skull fractures that don't cause bleeding and just with the skull fracture without the bleeding you wouldn't have the life-threatening event.

. . . . .

You can get the bleeding without skull fractures.

Q And you can get skull fracture without bleeding?

A Correct.

Trial Transcript at 263–64 (Dr. Creelman testifying).

Dr. Nakamura affirmed that "this baby after having been injured—the, the way this baby was, wouldn't be doing normal baby things." Trial Transcript at 548. But Dr. Nakamura also explained that

skull fractures can occur separately from internal brain injury. Bleeding can occur separate from skull fractures.... [A] *combination* of skull fractures and the type of *bleeding* that occurred in this child could not have occurred 24 hours before the child died.

Trial Transcript at 549–50 (emphasis added) (Dr. Nakamura testifying).

To affirm on review for sufficiency of the evidence, we must find sufficient evidence to permit a rational jury to have no reasonable doubt of the defendant's guilt. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970); *United States v. Penagos,* 823 F.2d 346, 347 (1987).

The majority also cites Dr. Brady's testimony that Quinton's coma was "not the story of a continuous downhill progressive lethargy and change." Trial Transcript at 780 (Dr. Brady testifying) (quoted in Opinion at 499 n. 2). Of course, that is true, but irrelevant to the question what caused the final hemorrhage.

Q Could subdural hematomas ever rebleed?

A They very commonly do....

Q So if you found fresh flood in the presence of a clot, would that be evidence of rebleeding?

A Sure. They can either relatively spontaneously rebleed ..., the clot breaks loose itself, it will rebleed. Or certainly if there is additional injury....

Trial Transcript at 389 (Dr. Brady testifying).

Although it is the jury that must resolve evidentiary conflicts, the problem here is not conflict but no evidence at all. No doubt a jury of reasonable-minded people could have confused when the skull fractures occurred with when the bleeding occurred. The majority has the same confusion. But basing a verdict on confusion is not rational. Nor does confusion become rational by virtue of being shared. If the evidence confused the jury, it was obliged to acquit. That the evidence was insufficient to convict rationally obligates us to reverse. Earl Boise stands convicted of attending a victim of violence whose bleeding recurred. The law must not allow the inference that all who are similarly placed are murderers.