**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald HOUSER, Defendant–Appellant.**

No. 96–30083.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 1997.

Decided Dec. 9, 1997.

Stephen R. Hormel, Assistant Federal Public Defender, Spokane, WA, for defendant–appellant.

James M. Peters, Assistant United States Attorney, Boise, ID, for plaintiff–appellee.

Before: CANBY and TASHIMA, Circuit Judges, and SILVER,* District Judge.

CANBY, Circuit Judge:

Donald Leonard Houser was convicted by a jury of murder in the second degree, in violation of 18 U.S.C. § 1111, and use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Houser is a non-Indian; his victim was an Indian. The crime occurred within the Coeur d'Alene Indian Reservation in Idaho.

Houser challenges his conviction on four grounds. He contends that: (1) the district court erred in instructing the jury that it could infer malice aforethought from his use of a deadly weapon; (2) the district court erred in instructing the jury that it could convict him of second-degree murder if it found that he had killed "with extreme disregard for human life"; (3) the district court erred in failing to instruct the jury that, to convict, it must find that Houser acted "willfully"; and (4) Congress lacks the power under the Indian Commerce Clause to proscribe crimes by non-Indians. We reject all of Houser's contentions, and affirm the judgment of the district court.

## BACKGROUND

The facts as shown by the prosecution's evidence were as follows. Houser and the victim, Angela Rae LaSarte, had dated off and on for about two years prior to her death. Houser was frequently violent toward LaSarte, often after bouts of heavy drinking. On the night in question, Houser had been drinking at Bobbi's Bar in Plummer, Idaho, for almost five hours. Houser left the bar briefly about 10:00 p.m. but then returned to have one last drink with his friend, Chris Biles. Houser saw LaSarte sitting in the bar with a friend, Nick Parker. An argument ensued between Houser and Parker, during which Houser attempted to strike Parker with a beer bottle.

Biles then physically removed Houser from the bar, but Houser returned shortly thereafter and became involved in a dispute with Biles. Houser became angry, went outside, and began kicking and punching Biles' truck. Biles came out to stop him. While Biles and Houser were arguing, LaSarte and Parker—as well as most of the bar's patrons—left the bar to observe the argument.

* The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

Eventually, Houser walked back to the cab of his truck and most of the patrons re-entered the bar. LaSarte, however, remained outside and watched Houser. Houser took a handgun from his truck, pumped a cartridge into the chamber of the gun, held the gun behind his back, and began walking towards the bar.

LaSarte then began walking toward Houser. They met in the middle of the street for a few seconds; neither spoke to or struggled with the other. After four or five seconds Houser brought his right arm to the left side of LaSarte's neck and shot her. Houser then knelt to the ground beside LaSarte. A spectator, Kim DeLorme, rushed to help La-Sarte, and Houser pointed his gun at her. Houser then ran into the bar, but bar patrons subdued and restrained him. LaSarte died later that evening from the gunshot wound.

Houser's view of events at the bar differed in crucial ways from that of the prosecution's witnesses. Houser testified that he got his gun out of the truck so he could scare the patrons that had gathered outside. He stated that he knew the gun was loaded, but did not know that a round was in the firing chamber. He also stated that he did not know the safety was off. He testified that, when he and LaSarte met in the parking lot, she attempted to wrest the gun from him and, in doing so, caused the accidental discharge of the weapon. After she fell and he knelt beside her, he got up and ran into the bar to call 911, but was subdued before he could do so.

Houser was subsequently convicted by a jury of murder in the second degree, in violation of 18 U.S.C. § 1111, and use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). This appeal followed.

---

1. We review for abuse of discretion the district court's formulation of a permissive-inference instruction, when the defendant raises a nonconstitutional claim of intrusion upon the jury's fact-finding role. *United States v. Warren*, 25 F.3d 890, 898 (9th Cir.1994). We reject the government's contention that Houser's objection to the instruction was so vague that we should review

## ANALYSIS

### I. Permissive Inference.

We address first the most troublesome issue raised by Houser. The district court gave the following instruction to the jury:[1]

> If it is shown that the defendant used a deadly weapon in the commission of a homicide, then you may infer, from the use of such weapon, in the absence of mitigating circumstances, the existence of malice aforethought, which is an essential element of the offense.
>
> This inference is not conclusive, but may be considered by you along with all the evidence in the case, or lack of evidence, in determining whether or not the killing charged, if done by the defendant, was done with malice aforethought.

The government points out that this instruction was approved in *United States v. Vallez*, 653 F.2d 403, 406 (9th Cir.1981), and *United States v. Washington*, 819 F.2d 221, 226 (9th Cir.1987). Subsequent to the decision of those cases, however, we convened an en banc court to consider the issue of permissive inferences in *United States v. Rubio–Villareal*, 967 F.2d 294 (9th Cir.1992) (en banc). There we found error in an instruction that permitted the jury to infer knowledge from the facts that cocaine was found in a vehicle and the defendant was the driver. Our en banc opinion set forth the prevailing criticisms of permissive inference instructions: they isolate a single fact in a way that permits the jury to avoid consideration of all of the other evidence in the case bearing on the element in issue. *Id.* at 298–99. We explained:

> [T]he instruction constituted an intrusion on the jury's deliberative process because it effectively told the jury in this case that the judge thought there was sufficient evidence to convict the defen-

---

under the plain error standard. Although it was not artfully stated, the objection adequately conveyed the view that the instruction was an improper comment on the evidence that invaded the province of the jury, and that the inference was more appropriately a matter for argument by the government.

dant. It was undisputed that Rubio–Villa-real was the driver and that there was cocaine concealed in the body of the vehicle. The only real issue in the case was whether Rubio–Villareal knew that the vehicle contained cocaine. Thus, the instruction was the equivalent of telling the jury that the judge had denied a defense motion for a directed verdict and explaining why. The instruction implies that the court has "prejudge[d] a conclusion which the jury should reach of its own volition." *Morissette [v. United States]*, 342 U.S. [246,] 275, 72 S.Ct. 240, 255, 96 L.Ed. 288 [1952]. *Id.* at 299.

Houser argues with considerable force that the deficiencies in the court's permissive inference instruction in *Rubio–Villareal* are present in his case. The primary issue in Houser's trial was whether the shooting was accompanied by malice aforethought-either because it was intentional or because it was the result of recklessness with extreme disregard for life. Houser's defense was that the shooting was wholly accidental; that he did not intend to use the gun but that LaSarte grabbed it and tried to wrest it from him, causing an accidental discharge. Houser argues that the instruction prejudicially charted a path to his conviction, as in *Rubio–Villareal*.

Our court has spoken on the subject since *Rubio–Villareal,* however. In *United States v. Warren,* 25 F.3d 890 (9th Cir.1994), we were presented with a permissive inference instruction virtually identical to the one given in Houser's case. After a "fact-intensive review," *id.* at 899, of the instruction in the light of *Rubio–Villareal,* we upheld the instruction. We explained that the trial court's statement that the jury was not obligated to make the inference did not save the instruction, but that other, additional instructions did:

[t]he court further stated that the jury "must not read into these instructions ... any suggestion as to what verdict you should return, that is a matter entirely up to you," and emphasized that the jury must consider all evidence relevant to the issue of malice. While giving the inference instruction, the court explained that "ex-planatory or mitigating circumstances" could negate the inference and reiterated the government's burden as proof beyond a reasonable doubt.

*Id.*

The district court in Houser's case included equivalent admonitions in the course of its instructions. The court informed the jury that it was the sole judge of the facts. It advised the jury no less than three times that it "should not take anything the court may say or do during the trial as indicating what the court thinks of the evidence or what your verdict should be." It told the jury that the choice of a verdict was "a matter entirely up to you." It informed the jury of the government's burden to prove guilt of each of the elements of the crime, including malice, beyond a reasonable doubt. The court also told the jury, both in the permissive inference instruction and elsewhere, that it must consider all of the evidence.

Finally, as in *Warren* (but not in *Rubio–Villareal* ), the permissive inference instruction informed the jury that it could infer malice from the use of a deadly weapon "in the absence of mitigating circumstances." Thus the jury was warned that the inference would be inappropriate under certain states of fact. This qualification was given meaning by the instruction that the court gave immediately after the permissive inference instruction. It told the jury that "[a]n accidental killing may be second-degree murder, manslaughter, or no crime at all" and then reiterated the government's burden of proving each element beyond a reasonable doubt.

We conclude that, in the light of all of the district court's instructions and of the posture of Houser's case, the permissive inference instruction met the requirements of *Warren.* The jury could not have been under the impression that the judge preferred a particular verdict, and its attention was not unduly focused on a single fact in a manner that created the danger of ignoring other evidence. The issues of mental state were clearly drawn for the jury. We therefore find no reversible error. In so holding, however, we call attention to another point made in *Warren:* the dangers and inutility of permissive inference instructions are such that

"[b]y inviting the district court to join in this process, the government risks introducing error, without gaining much tangible benefit." *Warren*, 25 F.3d at 900; *see also id.* (Rymer, J. concurring) ("[I]t seems to me both unnecessary and unwise for inference instructions to be requested, or given.").

## II. Extreme Disregard for Human Life.

■ Houser next challenges a different instruction regarding malice. The district court instructed the jury that it could find the malice aforethought necessary to convict Houser of second-degree murder if it concluded either that Houser killed LaSarte deliberately and intentionally, or that Houser killed LaSarte recklessly with extreme disregard for human life.[2] Houser contends that this instruction was erroneous because at common law, he asserts, "extreme disregard" referred to acts endangering the populace at large, and could not be applied to acts directed solely at the person killed. *See Colorado v. Jefferson*, 748 P.2d 1223, 1228 (Colo.1988). Houser argues that his acts were directed only at LaSarte, and consequently could not constitute "extreme disregard."

■ Houser neither objected to the district court's instruction nor proposed an alternative. For purposes of appeal, we would therefore review only for plain error. *United States v. Botello*, 70 F.3d 78, 79 (9th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1336, 134 L.Ed.2d 486 (1996). To qualify for discretionary relief under the plain error standard, Houser must show: (1) that there has been an error; (2) that it is plain under current law at the time of appeal; and (3) that the error affected substantial rights. *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). We need not address the third requirement, because Houser cannot satisfy the first two; there was and is no error at all.

■ It is true that some state courts have required the general malice referred to by Houser, but our circuit has not. Although we have not addressed Houser's precise argument, our cases clearly indicate that a jury can convict a defendant of second-degree murder under an "extreme disregard" theory even if the acts causing the victim's death were reckless only toward the victim herself. In *United States v. Lesina*, 833 F.2d 156, 159 (9th Cir.1987), we indicated that an instruction on "extreme disregard for human life" was proper for second-degree murder in a case where the danger appeared to be only to the victim. In other cases describing the level of malice required for second-degree murder, we have not required extreme disregard for life to encompass more than disregard for the victim's life. For example, in *United States v. Boise*, 916 F.2d 497 (9th Cir.1990), we upheld a conviction for second-degree murder where the defendant had killed a small child through "two blunt force blows to the head." The acts causing death in *Boise* were clearly directed solely at the victim; we nevertheless concluded that "the jury could rationally conclude beyond a reasonable doubt that Boise displayed 'a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences.'" *Id.* at 500.[3] Similarly, in *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir.1975), we upheld a second-degree murder conviction where the defendant killed a young woman by beating her with his fists and by repeatedly kicking a stick into her vagina. There, too, the acts causing death were directed solely at the deceased; again, we concluded that "[t]he act attributed to the [defendant] certainly permits, if it does not require, the conclusion that the homicide was accompanied by a callous and wanton disregard of human life." *Id.* at 459; *accord Starr v. Lockhart*, 23 F.3d 1280, 1292 (8th Cir.1994) (same); *United States v. Black Elk*, 579 F.2d 49, 50–51 (8th Cir.1978). In the face of these cases, the district court's instruction on "extreme disregard" cannot be regarded as erroneous.

---

**2.** Jury Instruction 17 stated, in relevant part:
  To kill with malice aforethought means to kill either deliberately and intentionally or recklessly with extreme disregard for human life.

**3.** Instruction 17 uses the expression "extreme disregard for human life" instead of "a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences." The two standards, however, are functionally equivalent. *See United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996).

## III. Willfulness.

■ Houser next contends that the district court erred in failing to instruct the jury that LaSarte's death must have been caused by a willful act. According to Houser, willfulness is an essential element of the malice required for second-degree murder, and the failure to instruct on it blurred the distinction between that crime and manslaughter.

Here again, we review under a "plain error" standard because Houser did not propose a "willfulness" instruction at trial, nor did he object to the failure of the district court to give such an instruction. *See Botello,* 70 F.3d at 79. And once again, Houser cannot meet the first two prongs of the *Olano* plain error standard; there was no error that was plain. *See Olano,* 507 U.S. at 733–34, 113 S.Ct. at 1777–78.

■ Although the statutory definition of first-degree murder includes "willful, deliberate, malicious, and premeditated killing," *see* 18 U.S.C. § 1111(a), that definition does not extend to second-degree murder. *See id.* The mental element of second-degree murder is "malice aforethought." *See United States v. Lesina,* 833 F.2d at 158–59. Malice aforethought does not require an element of willfulness if the existence of that malice is inferred from the fact that defendant acted recklessly with extreme disregard for human life. *Id.* at 159. The district court properly set forth the alternatives in instructing that "with malice aforethought" means "either deliberately and intentionally or recklessly with extreme disregard for human life."

This instruction also adequately differentiated second-degree murder from involuntary manslaughter. The district court defined involuntary manslaughter as killing "done with reckless disregard for human life but not of an extreme nature." Thus the jury was permitted to convict of second-degree murder if it found that Houser acted with "extreme" disregard for human life, but it could only convict of manslaughter if it found reckless disregard not rising to the extreme. This distinction sufficiently distinguished between the two crimes. *See id.*

## IV. Constitutionality of 18 U.S.C. § 1152.

■ Houser was tried for murder under federal law by reason of 18 U.S.C. § 1152, which provides that the general criminal laws of the United States shall extend to Indian country. Section 1152 is commonly employed when a non-Indian commits a crime against an Indian. *See, e.g., Williams v. United States,* 327 U.S. 711, 714, 66 S.Ct. 778, 779, 90 L.Ed. 962 (1946). Houser contends, however, that the Indian commerce clause of the Constitution does not grant Congress the authority to legislate against crimes by non-Indians. Houser relies on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held that the interstate commerce clause did not authorize Congress to outlaw possession of firearms in a school zone. The Supreme Court based its ruling on the lack of any necessary connection, or of legislative findings of such a connection, between gun possession in a school zone and interstate commerce. *Id.* at 560–61, 115 S.Ct. at 1630–31.

■ Section 1152 has no such deficiency, however, with regard to the Indian commerce clause; the statute applies only to crimes between non-Indians and Indians. From the early days of the Republic, Congress has exercised its power over commerce with the Indian tribes by regulating all manner of relations between non-Indians and Indians in Indian country. *See, e.g.,* Trade and Intercourse Acts, 1 Stat. 137 (1790), 2 Stat. 139 (1802), 4 Stat. 729 (1834). Criminal offenses between non-Indians and Indians were defined by several of those acts. *See Donnelly v. United States,* 228 U.S. 243, 270, 33 S.Ct. 449, 458, 57 L.Ed. 820 (1913). In light of this historical context, it is clear that Congress's power over commerce with the Indian tribes encompasses all forms of interaction between non-Indians and Indians in Indian country. The Indian Commerce Power is not subject to the same restrictions applicable under the interstate commerce clause:

It is ... well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian

Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.

*Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1715, 104 L.Ed.2d 209 (1989) (citations omitted). Since legislation relating to the tribes themselves falls within Congress's power over Indian commerce, *see United States v. Antelope,* 430 U.S. 641, 645 & n. 6, 97 S.Ct. 1395, 1398 & n. 6, 51 L.Ed.2d 701 (1977), it follows that legislation over matters between non-Indians and members of the tribes in Indian country does so as well.[4] There is accordingly no merit in Houser's contention that Congress lacks authority under the Indian Commerce Clause to provide, as it has in section 1152, for the punishment of crimes by non-Indians against Indians.

### CONCLUSION

The judgment of the district court is AFFIRMED.

---

4. Indeed, federal power over crimes by Indians was originally sustained on an even broader theory that the Indian tribes are wards of the nation. *See United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The Supreme Court later ruled that Congress's power over crimes by non-Indians against Indians was sustainable on the same theory, "perhaps *a fortiori.*" *Donnelly,* 228 U.S. at 271–72, 33 S.Ct. at 458–59.